**UNITED STATES of America,
Plaintiff,**

v.

**Richard L. HETZEL, Defendant.**

**No. 3667.**

United States District Court,
W. D. Missouri,
St. Joseph Division.

Nov. 22, 1974.

Bert C. Hurn, U. S. Atty., Donald R. Cooley, Asst. U. S. Atty., Kansas City, Mo., for plaintiff.

James A. Daleo, Robert Frager, Kansas City, Mo., for defendant.

MEMORANDUM AND ORDERS RE-VERSING CONVICTION FOR AL-LEGED VIOLATION OF THE BALD EAGLE PROTECTION ACT OF 1940

JOHN W. OLIVER, District Judge.

### I.

This case pends on defendant's appeal from a judgment of conviction upon which a $1.00 fine was imposed on March 27, 1972 by the Honorable Calvin K. Hamilton, Chief United States Magistrate for the Western District of Missouri, for an alleged violation of the Bald Eagle Protection Act of 1940, 16 United States Code § 668, as that Act read before its 1972 amendment by the Act of October 23, 1972, Pub.L. 92–535. Defendant's timely appeal was filed April 6, 1972. Chief Magistrate Hamilton stayed execution of the $1.00 fine pending this appeal.

This case was filed and prosecuted in the St. Joseph Division of this Court because the parts of the bald eagle, "to wit: both legs including tarsus and talons" (in the language of the information), involved in this case came from a dead and partially decomposed bird found by the defendant, several days after its death from unknown causes, on a beaver dam located in the Squaw Creek National Wildlife Refuge, Mound City, Missouri.

The Honorable Richard M. Duncan, throughout his long and distinguished career as a member of this Court, was assigned as the presiding judge of its St. Joseph Division. Those of us who knew him well might speculate about the reasons why Judge Duncan, who was well known for keeping his docket current had not decided the 1972 appeal before his untimely death on August 1, 1974. However, the files and records of this case show that the appeal is still pending and must be decided. Having been assigned duty as the presiding judge for the St. Joseph Division by order of the Court en Banc on November 15, 1974, and after having carefully con-sidered the briefs of the parties, we find and conclude that the judgment of conviction should be reversed outright and that the fine imposed thereon be set aside as void.

### II.

The information, filed January 11, 1972, alleged the following:

UNITED STATES ATTORNEY CHARGES THAT:

On or about December 5, 1971, RICHARD L. HETZEL, in Holt County Missouri, in the Western District of Missouri, did unlawfully take and possess the parts of a dead bald eagle, to wit: both legs including tarsus and talons, in violation of 16 U.S.C. 668.

Section 668, Title 16, U.S.C., as it read before its amendment, provided in its material parts that:

Whoever, . . . without being permitted to do so as provided in sections 668 to 668d` of this title, . . . shall take, possess, . . . at any time or in any manner, any bald eagle commonly known as the American eagle, or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, shall be fined not more than $500 or imprisoned not more than six months or both: . . .

Section 668c, Title 18, U.S.C., the definition section of the Bald Eagle Protective Act of 1940, as it read at the time of this prosecution, expressly provided that the word "take," as used in Section 668 "includes also pursue, shoot, shoot at, wound, kill, capture, trap, collect, or otherwise *willfully* molest or disturb," [emphasis ours]. It must be kept in mind that the United States Attorney charged in the information that the defendant allegedly did "unlawfully *take and possess* the parts of a dead bald eagle . . . in violation of 16 U.S.C. 668."

We attach hereto as an Appendix a copy of Chief Magistrate Hamilton's memorandum opinion which also con-

tained his findings of fact and conclusions of law. The factual circumstances were virtually undisputed from the outset of the case. We accept and adopt the factual findings made by Chief Magistrate Hamilton in his memorandum opinion and those expressly made as findings of fact. We reject, however, Chief Magistrate Hamilton's conclusions of law and reverse the conviction outright and set aside the fine for the reasons we now state.

### III.

 In order to sustain the defendant's conviction, it is clear that Chief Magistrate Hamilton adopted the government's argument, based solely upon its reading of Rogers v. United States, (8th Cir. 1966) 367 F.2d 998, that proof of "guilty knowledge and specific intent are not essential elements" of a Section 668 offense. Rogers v. United States, of course, did state that under the Migratory Bird Treaty Act, 16 U.S.C. §§ 703–711, it is not necessary that the government prove that a defendant violated its provisions with guilty knowledge or specific intent to commit the violation. The difficulty with the government's argument is that the defendant in this case was not prosecuted under the Migratory Bird Treaty Act. He was instead prosecuted for an alleged violation of Section 668 of the Bald Eagle Protective Act. Rules of decision developed under the Migratory Bird Treaty Act may not automatically be applied to a prosecution under the Bald Eagle Protective Act.

The legislative history of the 1972 amendment to the Bald Eagle Protective Act conclusively establishes that Congress expressly recognized that willfulness was an essential element of a violation of Section 668 as it read at the time of the defendant's prosecution. In fairness to Chief Magistrate Hamilton and to counsel for both parties, it should be stated that the 1972 legislative history of the 1972 amendment to the Bald Eagle Protective Act, Pub.L. 92–535, was

not available at the time this case was tried or at the time the briefs on appeal were written.

Senate Report No. 92–1159, U.S. Cong. & Admin.News, 92nd Cong., 2d Sess.1972, p. 4285, reflects Congressional concern with the then recent slaughter of nearly 500 rare bald and golden eagles which were gunned down from helicopters over ranches in Wyoming and Colorado during 1971. The Department of Interior's estimates of a golden eagle population of between 10,000 and 20,000 birds, and a bald eagle population of between 20,000 and 30,000 birds was noted, together with the fact that only an estimated 600 pairs of northern bald eagles and less than 400 pairs of southern bald eagles nested in the contiguous United States in 1971.

In amending Section 668 as it read at the time of this prosecution, the Senate Report stated that "the bill would increase the penalty to be imposed against violators *and lessen the degree of knowledge required to be proven* in order to convict violators." The Senate Report stated:

Over the past 5-year period, there have been only 32 Federal convictions under the Act, with fines and court costs totalling a meager $2,235. Although violators were subject to a maximum fine of $500, it appears that each violator convicted under the Act was fined an average of only about $50 per incident. In order to prevent, or deter, the taking of eagles in the future, violators should be subjected to greater penalties than allowed in the current law, *and the amount of knowledge required to be proved in order to obtain a conviction in this type of case should be reduced.* The committee concludes that it is only in this way that bald and golden eagles can be given the protection to which they are entitled. [Ibid 4288] [emphasis ours].

The section-by-section analysis in the Senate Report stated the following in regard to the specific amendment made in

regard to Section 668 as it read at the time the defendant in this case was prosecuted:

Section 1 of H.R. 12186 would amend section 1 of that Act by increasing the penalty to be imposed against violators from up to $500 and/or 6 months in jail to up to $5,000 and/or 1 year in jail for the first offense and up to $10,000 and/or 2 years imprisonment for each subsequent conviction. Also the degree of knowledge required to be proven in order to convict violators is reduced from "willfully" to "knowingly or with wanton disregard for the consequences of his act." [Ibid 4288–4289] [emphasis ours].

The section-by-section analysis of § 4, which amended Section 668c, the definition section, specifically applicable to Section 668, stated that "Section 4 of the bill would lessen the degree of knowledge required to be proved to gain a conviction for taking bald and golden eagles and would broaden the definition of the word 'take' as used throughout the Act." [Ibid at 4291].

The concluding sentence of the section-by-section analysis of Section 4 flatly stated that "Heretofore only those who willfully violated the Act would be subject to a penalty." [Ibid 4291].

We are convinced that even in the absence of the direct Congressional expression concerning the necessity of proving willfullness as an element of a Section 668 offense, as contained in the definition section applicable thereto, principles articulated in Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L. Ed. 288 (1952) may have required the conclusion that willfulness and specific criminal intent were essential elements of a Section 668 prosecution as that statute read at the time the defendant was in fact prosecuted. We need not reach that question because any possible doubt in regard to Congressional intent is resolved by Congress' express recognition that all persons prosecuted under Section 668 before the 1972 amendment could not be convicted without proof beyond reasonable doubt that they had in fact *willfully* violated the Act.

 Our conclusion that willfulness and specific intent are essential elements of a Section 668 prosecution, as that statute read at the time the defendant was prosecuted, requires a further conclusion that the information filed not only was subject to dismissal upon proper pretrial motion but that such information is legally insufficient to support a conviction. Fifth Amendment requirements stated in United States v. Denmon, (8th Cir. 1973) 483 F.2d 1093, require reversal because of the failure of the information to allege that the defendant "acted knowingly, unlawfully, and willfully." We so find and conclude.

Outright reversal, rather than remand for a new trial, is required for the separate and independent alternative ground stated in the next part of this opinion.

### IV.

The enacting clause of the Act of June 8, 1940 under which the Bald Eagle Protective Act was initially passed, provided:

WHEREAS the Continental Congress in 1782 adopted the bald eagle as the national symbol; and

WHEREAS the bald eagle thus became the symbolic representation of a new nation under a new government in a new world; and

WHEREAS by that Act of Congress and by tradition and custom during the life of this Nation, the bald eagle is no longer a mere bird of biological interest but a symbol of the American ideals of freedom; and

WHEREAS, the bald eagle is now threatened with extinction: THEREFORE

Be it enacted * * * 1

---

1. It is perhaps not inappropriate during this Thanksgiving Season to point out that if

Benjamin Franklin's view of the Bald Eagle had been accepted, this case would not be

Defendant argues on appeal that by its enactment of the Bald Eagle Protective Act of 1940 "Congress did not intend that innocent possession of parts of a dead eagle to be a crime or that persons in otherwise innocent possession of parts of a dead eagle to be prosecuted." In proper lawyer-language, appellant argued:

Appellant submits that Congress never intended to make it a criminal act for a person, coming across an already dead and decomposed bird, to possess same or any part thereof including the tarsus, talons and/or feathers and/or any other part, for an innocent and common purpose, in this case, a boy scout decoration.

The late James Daleo, counsel for the defendant, and a life-long supporter of the Kansas City Council of Boy Scouts of America, undoubtedly had Chief Bartle, resplendent in his Eagle feather headdress, and all of the other Scouts and Scouters who participated in the Indian Dances which traditionally closed the annual Boy Scout round-ups in mind when he argued that under the government's construction of § 668 "thousands of Boy Scouts who have innocently obtained and now possess eagle feathers would also be subject to criminal prosecution by the government."

That is an argument which deserves appropriate judicial consideration. For this case, in the language of *Morissette,* "would have remained a profoundly insignificant case to all except its immediate parties had it not been so tried . . . as to raise questions both fundamental and far-reaching in federal criminal law" [342 U.S. at 247, 72 S.Ct. at 241].

The only reply which the government attempts to make to appellant's argument is that Section 668 must be given a literal construction. It suggests that one who may have innocently cut the talons off an already dead bald eagle should nevertheless be convicted of a federal criminal offense because the Congress wanted to make certain that "the Conservation officials know of all the deaths of the national bird and the causes thereof in order that proper precautions can be taken if a disease or some other preditory [sic] animal is endangering the species as a whole."

By reading between the lines of the government's expression of the same notion, one may at least surmise the reason this prosecution was authorized in the first place. The government stated that "In this case, it was clear that Mr. Richard Hetzel, Appellant, was taking the bald eagle parts for personal use *and was not going to report such taking to the Conservation officials* [emphasis ours].

█ It is quite clear that the Congress did not provide in Section 668 that all persons coming upon dead bald eagles shall make any report of any kind to a Conservation official. The expansive legislative purpose which the government would give Section 668 does not explain how a Conservation official could diagnose the death of a bald eagle by examination of his talons. We think it obvious that the defendant can not be criminally liable for failing to report the existence of a dead bald eagle to a Conservation official when Congress has never passed any statute, including, but not limited to Section 668, which would attempt to place such an obligation upon a private citizen. The government's contentions in this regard are totally without merit.

The real essence of the government's argument is that Section 668 does not contain any requirement that a person

---

before this Court. Benjamin Franklin commented upon the 1782 action of the Continental Congress in his letter of January 26, 1784 to Sarah Bache that:

I wish the Bald Eagle had not been chosen as the Representative of our Country; he is a Bird of bad moral Character; like those among Men who live by Sharping and Robbing, he is generally poor, and often very lousy.

The Turky [sic] is a much more respectable Bird, and withal, a true original Native of America.

must be found to have had a criminal intent and that, under a literal construction of the statute, criminal intent need not be established to support a conviction. Defendant's quite fundamental countering argument is based upon well established principles that all laws should receive a sensible construction and that broad and literal application should not be made to lead to an absurd consequence. The principles which defendant contend are applicable to this case extend back in American jurisprudence at least as far as Chief Justice Marshall's opinion in United States v. Palmer, 3 Wheat. 610, 4 L.Ed. 471 (1818). Mr. Justice Story, sitting on circuit as a trial judge with District Judge John Davis in the District of Massachusetts, certified to the Supreme Court particular questions presented in regard to the construction of the Act of April 30, 1790, relating to piracy. The questions certified required a determination of whether or not a literal interpretation should be given such words as "any person or persons" and "any captain or mariner of any ship or other vessel." Chief Justice Marshall stated the obvious when he said that under a literal construction of the statute those words could be read to "comprehend every human being" and "the whole human race." Chief Justice Marshall noted, however, that a literal construction would apparently support prosecutions by the United States against "any person" on board ships which "belong exclusively to a subject of a foreign state." The Court concluded that such prosecutions could not properly be considered "within the true intent and meaning of the Act" and that the literal construction should therefore be rejected in favor of a reasonable one.

■ Chief Justice Marshall, as frequently was his wont, did not cite any authority to the rule stated and applied in *Palmer*. However, Mr. Justice Fields' opinion in United States v. Kirby, 7 Wall. 482, 486, 19 L.Ed. 278 (1868), establishes that the rule that criminal statutes must be given a sensible rather than a literal interpretation was deeply rooted in the common law. The Act of March 3, 1825 was involved in *Kirby*. That Act prohibited any person from knowingly and willfully obstructing or retarding the passage of the mail.

Back in 1867 one Farris, who was a carrier of the mail, was indicted for murder in the Circuit Court of Gallatin County, Kentucky. The State court judge issued a bench warrant and directed Kirby, the sheriff of Gallatin County, to seize Farris and to bring him before the State court. Kirby did so and by that action effectively prevented Farris from delivering the mail. The federal government gave a literal reading to the Act of March 3, 1825, and obtained an indictment from a federal grand jury charging Sheriff Kirby with obstruction of the mail. The question of "whether the arrest of the mail-carrier upon the bench warrant from the Circuit Court of Gallatin County was, under the circumstances, an obstruction of the mail within the meaning of the Act of Congress," was certified to the Supreme Court.

Mr. Justice Field, for a unanimous court, answered the certified question in the negative by applying the cardinal rule "that all laws should receive a sensible construction," and that literal interpretations which "lead to injustice, oppression, or an absurd consequence" should be avoided. The Court concluded that "The reason of the law in such cases should prevail over its letter."

The following quotation from Mr. Justice Fields' opinion in *Kirby*, with its references to Samuel Puffendorf, who published his classic treatise in 1672, and to Edmund Plowden, the great English jurist who went to his reward in 1585, illustrates that the rule stated in *Palmer* and *Kirby* indeed has deep roots in the ancient common law:

The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted, "that whoever drew blood in the streets should be punished with the

utmost severity," did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire—"for he is not to be hanged because he would not stay to be burnt." [7 Wall. at 487]

■ Consistent with the principles stated, we are convinced that the government's literal construction of Section 668 should be rejected. We find and conclude that such section was never intended and may not properly be considered applicable to the taking and possession of the talons of the dead bald eagle under the undisputed factual circumstances of this case. We accordingly find and conclude that the conviction and fine cannot stand.

## V.

■■ Outright reversal rather than remand is the only appropriate disposition of the pending appeal. The evidence adduced at the trial established that the government simply cannot offer any additional evidence to meet the standard of proof required by Section 668 as that statute read at the time of the prosecution. It is obvious that defendant cannot be tried under Section 668 as amended in 1972 because of *ex post facto* considerations. Even if such a prosecution could be constitutionally maintained, there is no available evidence to establish that the defendant acted "knowingly, or with wanton disregard for the consequences of his act" when he did "take and possess" the dead bald eagle from the beaver dam. Everyone is in agreement that, on the facts, the defendant simply picked up the dead eagle in anticipation of using its talons for an appropriate Scouting exhibit.

What we have said effectively buries any further criminal prosecution which may relate to the talons of the dead bald eagle which the defendant found on the beaver dam in the Squaw Creek Wildlife Refuge. It does not, however, decide what should happen to the eagle talons, which were introduced in evidence as Government's Exhibit No. 1.

That question, of course, must be presented to Chief Magistrate Hamilton, the trial judge, when and if a proper motion is made in regard to the ultimate disposition of Exhibit No. 1. We are confident that any decision that may be made in connection with the ultimate disposition of the talons of the dead bald eagle will be made consistent with the power vested in the Secretary of the Interior who is authorized by § 668a, Title 16, U.S.C., to conduct an investigation and determine whether it is compatible with the preservation of the bald eagle to permit the possession of particular specimens for scientific or exhibition purposes.

It is entirely conceivable that, after appropriate investigation, the Secretary of the Interior may authorize the return of the eagle talons to the defendant, provided a particular Troop of the Boy Scouts of America would agree to prepare an appropriate troop exhibit or trophy of some sort consistent with the legislative intent declared by the Congress when it initially enacted the Bald Eagle Protective Act of 1940. The talons of the bald eagle involved in this case might, within the meaning of the enacting clause of the Act of June 8, 1940, become a "symbolic representation of a new nation, under a new government in a new world." And that those talons may be included in an exhibit which could become a "symbol of the American ideals of freedom." Perhaps such a disposition of Exhibit No. 1 might make the time and expense of this litigation serve some worthwhile purpose.

For the reasons stated, it is

Ordered (1) that the judgment of conviction should be and the same is hereby reversed outright and the fine of $1.00 be set aside and held to be void. It is further

Ordered (2) that further proceedings may be conducted before Chief Magistrate Calvin K. Hamilton in regard to a proper and appropriate disposition of Exhibit No. 1, the talons of the dead bald eagle involved in this case.

## APPENDIX

United States of America, Plaintiff,

v.

Richard L. Hetzel, Defendant.

Magistrate's Docket No. 172

Case No. 29

March 27, 1972

## MEMORANDUM

On January 11, 1972, an Information in one count was filed charging the defendant with violation of 16 U.S.C. § 668. On January 20, 1972, the defendant appeared in response to a summons and was fully informed of his rights. He was released on Personal Recognizance. On January 28, 1972, an Omnibus Hearing was held. On February 4, 1972, the defendant waived trial in the United States District Court and consented to be tried by the United States Magistrate. Upon arraignment, on that date, the defendant entered a plea of not guilty. The defendant was given until February 21, 1972, to file motions and the case was set for trial on March 27, 1972. On February 9, 1972, the defendant filed a motion to suppress physical evidence and admissions made by the defendant. The prosecution's response to the defendant's motion to suppress was filed March 2, 1972.

On March 27, 1972, the case was called for trial. By agreement of both parties, the pertinent testimony at the trial was considered in connection with defendant's motion to suppress.

The prosecution called Harold H. Burgess, Manager, Squaw Creek National Wildlife Refuge, Mound City, Missouri, as its sole witness.

Witness Burgess testified that on December 5, 1971, he observed a dead bald eagle in a drainage ditch and noticed that both legs, including the claws, had been removed from the carcass. He went to the nearest blind and spoke with two hunters that were in the blind, Mr. Edward H. Bergman and his son Scott. While Burgess was at the blind, the defendant came to the blind and asked him what he was doing. Burgess stated that he was looking for eagle claws, whereupon the defendant said, "I have them." Burgess informed the defendant that he wanted the claws and was told by the defendant that they were in his jeep. At the defendant's invitation, he accompanied the defendant to a jeep parked nearby where the defendant voluntarily reached into the jeep and removed the two legs taken from the dead bald eagle and gave them to him. Burgess was not sure whether he made a statement to the defendant that if he gave him the eagle claws that the matter would probably end there.

At the insistence of the defendant, Burgess made a notation on his investigative report that the defendant had voluntarily surrendered the eagle claws to him.

During the testimony of Burgess, plaintiff's Exhibit No. 1, the two legs removed from the dead bald eagle, was admitted in evidence.

The defense called Edward H. Bergman, Scott Bergman, and the defendant as witnesses. The testimony of both Bergman's was almost identical to the testimony of Burgess. The defendant testified that on December 5, 1971, while crossing a bridge over a drainage ditch he noticed a number of dead birds lodged against a beaver dam. He observed that one of the dead birds was a bald eagle which he could tell, from the condition of the carcass, had been dead several days. He removed the legs from the dead bald eagle with the intention of taking the claws to Boy Scouts that he worked with. As he walked by his jeep he laid the two legs in the jeep in "plain view." Later, he was told by Scott Bergman that Burgess was at the blind asking about eagle claws. He went to the blind and asked Burgess what he

was doing. Burgess asked him if he knew anything about eagle claws. He told Burgess that he had them and that Burgess told him he wanted them. He informed Burgess that they were in the jeep. He then accompanied Burgess to the jeep and gave him the eagle claws. On the way to the jeep from the blind Burgess made the statement, "I have got to do this but this will probably be the end of it." The defendant stated that he did not know that it was illegal to possess the eagle claws.

## FINDINGS OF FACT

1. On December 5, 1971, Richard L. Hetzel found the carcass of a bald eagle that had been dead for several days in a drainage ditch near the Squaw Creek National Wildlife Refuge, Mound City, Missouri, and removed the legs from the carcass.

2. Richard L. Hetzel placed the legs removed from the dead bald eagle in plain view in his jeep.

3. Richard L. Hetzel removed the legs from the dead bald eagle with the intention of giving the claws to Boy Scouts with whom he was working.

4. Richard L. Hetzel did not know that it was a violation of law to possess the legs he had removed from the dead bald eagle.

5. In response to a statement made by Harold H. Burgess, Richard L. Hetzel voluntarily told Burgess that he had the eagle claws and that they were in his jeep.

6. Richard L. Hetzel voluntarily accompanied Harold H. Burgess to the jeep and gave the eagle claws to Burgess.

7. Richard L. Hetzel was not in custody at the time he admitted being in possession of the eagle claws and at the time he delivered them to Burgess.

8. No Miranda type warning was given by Harold H. Burgess prior to Richard L. Hetzel making incriminating statements.

9. Harold H. Burgess did not advise Richard L. Hetzel of his right to refuse to consent to a search of his jeep and of his right to refuse to deliver the eagle claws to Burgess.

## CONCLUSIONS OF LAW

1. Section 668, Title 16, United States Code, does not require guilty knowledge and specific intent to violate same. Rogers v. United States, 367 F.2d 998, 1000–1001 (8 Cir. 1966), cert. denied 386 U.S. 943, 87 S.Ct. 976, 17 L.Ed.2d 874.

2. Section 668, Title 16, United States Code, is applicable to any person possessing a dead bald eagle or any part thereof.

On the basis of the testimony of the witnesses, it is quite clear that the incriminating statements of the defendant regarding his possession of the eagle claws were freely and voluntarily made and that the interrogation, if any, was not at a time when the defendant was in custody. Therefore, his motion to suppress the incriminating statements is denied. Further, the testimony clearly shows that the defendant freely and intelligently consented to the search of his jeep. In fact, he voluntarily removed the eagle claws from the jeep and delivered them to Burgess. Kilcrease v. United States, 457 F.2d 1328 (8 Cir. 1972). Therefore, defendant's motion to suppress physical evidence is likewise denied.

On all the evidence, the defendant is guilty as charged in the information. He is hereby convicted of the charge in the information.

s/Calvin K. Hamilton

Calvin K. Hamilton
United States Magistrate