**UNITED STATES of America, Plaintiff,**

v.

**John C. BRYSON et al., Defendants.**

**Crim. A. No. 76–27.**

United States District Court,
D. Delaware.

June 3, 1976.

John H. McDonald, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

F. Michael Parkowski, Dover, Del., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

STAPLETON, District Judge:

This is a prosecution in which defendant John Bryson and, originally, two co-defendants were charged with "pursu[ing], hunt[ing], tak[ing] and kill[ing] migratory game birds . . . by the aid of baiting and on or over a baited area. . . ." in violation of 16 U.S.C. § 703 and 50 C.F.R. § 20.21(i). Trial was to the Court.

After presentation of the prosecution's evidence, judgments of acquittal were entered respecting John Bryson's co-defendants because there was insufficient evidence to establish that they had hunted "on or over" a "baited area" and because they had not been shown to have had any connection with the placing or exposing of the pile of corn which was allegedly serving to lure the birds being hunted. Because there was some evidence to indicate that John Bryson might have been connected with the placing of the corn, his motion for judgment of acquittal was denied. Mr. Bryson then presented his defense and the case is before me now for decision. Based on the record made at trial, and the parties' post-trial submissions, I make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The defendant, John C. Bryson, together with Thomas J. Bryson and Alan W. Prehmus, was engaged in taking and attempting to take migratory waterfowl, specifically Canada geese, on November 8, 1975, between the hours of 6:30 A.M. and 7:30 A.M.

2. John C. Bryson and his two companions were so engaged on the Texas Ranch Farm in Kent County, Delaware, in the Judicial District of Delaware.

3. The Texas Ranch Farm is located on the east side of County Road 86 approximately one mile southeast of the town of Leipsic, Delaware, and is bounded on the south by Muddy Branch, on the northeast by Bombay Hook National Wildlife Refuge, and on the north by privately owned farmland.

4. The Texas Ranch Farm is owned by a corporation, one of whose stockholders is William C. Holden, who exercises supervision and control over the Texas Ranch Farm.

5. During the 1975 planting season, William C. Holden leased the fields of the Texas Ranch Farm to Henry F. Carey, II for agricultural purposes.

6. During the 1975 growing season, Henry F. Carey, II planted corn and soybeans on the Texas Ranch Farm, corn being the predominant crop planted.

7. On or about October 15 or 16, 1975, Henry F. Carey, II harvested his corn crop on the Texas Ranch Farm, except for the corn planted on the easternmost field of the Farm, which by agreement with William C. Holden, was left standing.

8. Henry F. Carey, II harvested the corn by means of a "picker-sheller", a mechanical device similar to a combine, which cuts the stalks of the standing corn, strips ears of corn from the cut stalks, removes the kernels of corn from the shucked ears, and deposits the kernels into a tank on the picker-sheller, and discharges the husks, cobs and stalks onto the ground.

9. The picker-sheller used by Henry F. Carey, II in harvesting the corn crop on the Texas Ranch Farm picked three rows of corn at a time and deposited the kernels into a self-contained tank having a capacity of approximately 90 bushels of corn.

10. Henry F. Carey, II, during the 1975 harvest season, intended to and did sell his corn harvest to commercial processors for about $1.56 per bushel, and endeavored to operate his picker-sheller at peak efficiency.

11. It is necessary to transfer the kernels of corn from the tank on the picker-sheller to a truck or wagon when the tank is filled. The transfer from picker-sheller to another vehicle is performed by means of an auger which propels the corn from the tank to the receiving container by means of a spout.

12. It is not unusual for spills of grain to occur during transfer from the picker-sheller tank to a truck or trailer. Spills may result from misdirection of the spout, over-filling of the truck or trailer, failure of the tailgate or sides of the truck or trailer, and from other causes.

13. On October 16, 1975, there occurred a spill of shelled corn during transfer from a picker-sheller to a waiting truck at a point located on the north side of the easternmost man-made pond on the Texas Ranch Farm (point A, GX–2); the amount of the spill was approximately fifty bushels.

14. This spill resulted from an accidental failure to secure a board in the back of a trailer, by reason of which failure the corn spilled out onto the ground.

15. From an agricultural viewpoint, it is not economically feasible to recover all of the grain so spilled, because of time and labor costs, contamination of the grain with soil and moisture, and possible spoilage of the grain.

16. Several days after the spill in question, Henry F. Carey, II and Charles Short, the operator of the truck involved in the spill, recovered most of the corn spilled, but left ten or fifteen bushels of shelled corn lying where it had fallen.

17. On November 4, 1975, at the time a United States Fish and Wildlife Service aircraft flew over the Texas Ranch Farm and took photographs of the area, including the point of the spill, there remained in the field a deposit of shelled corn amounting to about 500 pounds, measuring approximately 9½ feet in diameter and six inches in depth, situated at the northeast corner of the easternmost pond on the Texas Ranch Farm.

18. On November 4, 1975, the farm roads and fields in the immediate vicinity of the pile of corn in question were dry and would support vehicular traffic.

19. On November 6, 1975, agents of the United States Fish and Wildlife Service entered onto the Texas Ranch Farm, and obtained a sample of the corn found at the point of the spill (GX–5).

20. Between November 4 and 8, 1975, Fish and Wildlife Service Agents maintained sporadic observation of the field where the corn was located.

21. At about 6:30 A.M. on November 8, 1975, the Fish and Wildlife Service Agents established observation of the field from a point south of Muddy Branch located not more than 1,000 yards from the location of the deposit of corn. Initially, the agents' vision was hampered by darkness and fog. The fog lifted before 7:00 A.M.

22. When light and atmospheric conditions permitted, the agents observed a blind, which had not been there the previous day, located approximately 100 yards northeast of the location of the deposit of corn. The blind was situated atop a slight rise in the field and faced in a northerly direction. Canada goose decoys were arrayed on the north side of the blind at distances between fifteen and thirty-five yards from the blind.

23. The Agents observed three hunters in the blind shoot at least one Canada goose which was flying in front of the blind apparently intending to land in the area of the decoys.

24. Upon observing this activity, the agents left their observation point and proceeded to the entrance to the Texas Ranch Farm. Finding the gate locked, they proceeded on foot to the blind which they had observed earlier that morning. In the blind, agents found John C. Bryson, Thomas J. Bryson and Alan W. Prehmus. The blind was open on top and the hunters could shoot in any direction from the blind. Inside the blind were two freshly killed Canada geese.

25. There were numerous flights of Canada geese passing over the Texas Ranch Farm on November 8, 1975. Two of the flights of geese passed low over the defendant's blind at an altitude of fifteen to twenty-five yards.

26. The maximum effective range of the defendant's shotgun was no more than fifty yards.

27. On November 8, 1975, the deposit of corn amounted to about 300 pounds, the topmost layers of which remained bright, shiny and edible by Canada geese. (GX–4). On November 6, 1975, Fish and Wildlife Service Agents had observed a flock of about twenty Canada geese feeding on the deposit of corn and their examination of the immediate area of the corn showed the presence of goose feathers, footprints and droppings.

28. Migratory waterfowl will, through repeated feeding, be induced to return to an area where feed, grain and other edibles are

present, and will do so for a period of time after the edible substance is completely removed. Food has a stronger attractive influence over the actions of wild migratory waterfowl than artificial decoys, artificial calls and gravel ingested by the birds as an aid to digestion.

29. The position of the blind in which the defendant was hunting on November 8, 1975, was the highest point in the field; the pond adjacent to the deposit of corn measured approximately fifty by eighty yards.

30. The influence exerted by feed, grain, or other edibles extends beyond the outer perimeter of the place where the feed, grain or other edibles are physically located.

31. The lower portion of the deposit of corn had turned to sour mash and some kernels of corn had germinated by November 8, 1975.

32. The odor of sour corn did not permeate the area and was not noticeable until efforts were made after the apprehension of the defendant to manually remove all of the remaining deposit of corn.

33. The deposit of corn was capable of · luring, attracting and enticing migratory waterfowl.

34. The position of the blind on November 8, 1975 was not selected by John C. Bryson but was selected by William C. Holden. John C. Bryson did not know, prior to the time he was apprehended by Fish and Wildlife Service Agents, of the location or existence of the deposit of corn. Indeed, although John C. Bryson had a standing invitation from William C. Holden to hunt migratory waterfowl on the Texas Ranch Farm, John C. Bryson did not decide to go hunting until November 7, 1975.

35. Migratory birds lured by the deposit of corn from their resting areas on Delaware Bay and adjacent marshlands could be expected to fly within shotgun range of the blind from which defendant John C. Bryson was hunting on November 8, 1975.

## CONCLUSIONS OF LAW

 1. 50 C.F.R. § 20.21 provides in part:

Migratory birds on which open seasons are prescribed in this part may be taken by any method except those prohibited in this section. No person shall take migratory game birds:

\* \* \* \* \* \*

(i) By the aid of baiting, or on or over any baited area. As used in this paragraph, "baiting" shall mean the placing, exposing, depositing, distributing, or scattering of shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed so as to constitute for such birds a lure, attraction or enticement to, on, or over any areas where hunters are attempting to take them; and "baited area" means any area where shelled, shucked, or unshucked corn, wheat or other grain, salt, or other feed whatsoever capable of luring, attracting, or enticing such birds is directly or indirectly placed, exposed, deposited, distributed, or scattered; and such area shall remain a baited area for 10 days following complete removal of all such corn, wheat or other grain, salt, or other feed. . .

2. 50 C.F.R. § 20.21 thus prohibits two different kinds of conduct: (1) taking migratory birds with the aid of baiting and (2) taking migratory birds on or over a baited area. *Allen v. Merovka*, 382 F.2d 589 (10th Cir. 1967); *Clemons v. United States*, 245 F.2d 298 (6th Cir. 1957).

3. When one inserts the statutory definition and eliminates the wording having no significance in the case before the Court, the "aid of baiting" prohibition reads as follows:

No person shall take migratory game birds by the aid of placing or exposing shelled corn so as to constitute for such birds a lure to, on or over any areas where hunters are attempting to take them.

When one restates the "on or over a baited area" prohibition in the same fashion, it reads:

No person shall take migratory game birds on or over any area where shelled corn, capable of luring such birds, is directly or indirectly placed or exposed.

4. In order to secure a conviction for taking migratory game birds by aid of baiting, the government must prove that a hunter had some part, directly or indirectly, in the placing or exposing of the bait or, at the least, that the baiting was done for his benefit as a part of the hunting method. *Allen v. Merovka, supra.* It is important to note that if the government makes this showing, it does not matter how far away from the bait the hunter is located. He is guilty even if the bait is miles away so long as it served to lure the birds "to, on, or over" the place where the hunter was attempting to take them. In short, if a hunter has something to do with the placing of the bait, he may not lawfully take migratory birds anywhere within the "zone of influence" of that bait.

5. The second prohibition of Section 20.21(i) has a different scope, however. It does not speak about birds being lured *"to, on or over any areas where hunters are attempting to take them."* Rather, it prohibits the taking of birds *on or over the area where the bait has been placed.* Moreover, there is no connotation in the wording of the prohibition that the hunter must have utilized baiting to aid in his hunting— the prohibition is an absolute one. If a hunter takes a migratory game bird "on or over a baited area", he is guilty even in the absence of any connection with the placing of the bait.

6. In the present case, the defendant's blind was located approximately 100 yards from the bait and in the direction of resting areas of the birds in nearby marshlands. Canada geese had been attracted to the deposit of corn on preceding days and I believe that the birds taken by the defendant and his fellow hunters were lured over the blind area, in part at least, by the corn deposit beyond it. The defendant was thus hunting within the "zone of influence" of the bait. The defendant is not guilty of taking birds with the aid of bait, however,

because, as the government now concedes, he had no connection whatever with the corn spill and no knowledge of the existence of the corn deposit. The remaining question, therefore, is whether the defendant took a migratory game bird "on or over" an area where shelled corn had been placed.

7. Read literally, the prohibition against taking birds on or over a baited area proscribes taking on the surface of the area where the bait has been placed or at any point in the air space above that ground area. The government urges, however, that a less literal reading of the prohibition is proper. Specifically, it claims that this prohibition covers the taking of migratory birds on or over *any* area from which a hunter could take a bird who is in the process of being lured to the bait. This, of course, is just another way of stating the "zone of influence" concept expressly embodied in the "aid of baiting" provision. The government, however, has not offered any explanation why the same concept would be described in the same sentence of a regulation in such different language. Nor does it suggest any reason why the Secretary of the Interior would proscribe certain conduct, in the "on or over a baited area" provision, without reference to any connection between the hunter and the placing of the bait, and, at the same time, go on to proscribe the same conduct, in the aid of baiting provision, but only so long as the defendant is connected with the placing of the bait. In short, if the "zone of influence" concept is read into the "on or over" provision, as the government suggests, the aid of baiting provision would no longer have any independent significance.

8. I think it quite clear that the draftsman of Section 20.21 intended the two sections of this regulation to proscribe different conduct and that "on or over a baited area" means something different than "to, on or over any area where hunters are attempting to take" birds. Moreover, given the context, I think it fair to assume that the draftsman intended the absolute liability portion of the regulation to operate in a

substantially more restricted sphere than the "zone of influence" of the bait. It is one thing to impose absolute criminal liability for conduct in a geographic area in which one desiring to hunt lawfully can conduct an investigation and satisfy himself of the absence of bait; it is quite another to impose absolute criminal liability for conduct in a geographic area so large that investigation is not feasible.

9. This does not precisely answer the question of what is meant by "on or over" an area where bait has been placed. The defendant insists that the terms must be given their literal meaning. The government protests that such a construction is too narrow and will present serious enforcement problems. At the same time, the government has suggested no interpretation of this language other than the "zone of influence" reading I have already rejected.

10. I conclude that the words "on or over an area where bait has been placed" should be given their literal meaning. I do so because I am unable to find any other meaning which can fairly be said to be conveyed by those words and which, at the same time, is consistent with the other provisions of the regulation. If according to the Secretary's words only their literal meaning creates an enforcement problem, I believe the appropriate remedy is for the Secretary to amend this regulation and more clearly advise hunters what is expected of them.

11. Defendant Bryson and his fellow hunters took two Canada geese over the decoy area in front of their blind. This area was more than one hundred yards from the deposit of corn. Defendant Bryson did not take a migratory bird on or over a baited area.

A verdict of not guilty will be promptly entered.