UNITED STATES of America, Plaintiff,

v.

CORBIN FARM SERVICE, Patrick William Feeney, Frank Harry Michaud, Jr., and John Richard Harris, Defendants.

Crim. No. S–77–179.

United States District Court,
E. D. California.

Jan. 23, 1978.

Herman Sillas, U. S. Atty., Richard W. Nichols, Chief Asst. U. S. Atty., Sacramento, Cal., for plaintiff.

Francis E. Coats, Hewitt, McBride, Kenward & Coats, Yuba City, Cal., for defendants Corbin Farm Service and John Richard Harris.

Donald Cole Byrd, Geis, Meckfessel & Hopkins, Willows, Cal., for defendant Patrick William Feeney.

O. Douglas Memmot, Willows, Cal., for defendant Frank Harry Michaud, Jr.

## OPINION

MacBRIDE, Chief Judge.

Defendants are charged in a twelve count information with misdemeanor violations of a Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq.*, and the Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 703 *et seq.*; the alleged violations arise from the application of a registered pesticide to an alfalfa field and the subsequent death of a number of American widgeon, a water fowl protected under the MBTA. Defendants have responded with a number of pretrial motions.

The defendants are Corbin Farm Service (CFS), a dealer and distributor of pesticides; John Richard Harris, a CFS employee who provided pesticide advice to farmers with the expectation that they would purchase from CFS; Patrick William Feeney, the owner of the alfalfa field; and Frank Harry Michaud, Jr., the licensed aerial operator who sprayed the field.

The twelve count information alleges in Count 1 that CFS, through its agents and employees, violated FIFRA by causing a registered pesticide to be applied in a manner contrary to its labeling. Count 2 alleges that Harris, Feeney and Michaud also violated FIFRA by applying or causing the pesticide to be applied contrary to its labeling. Finally, Counts 3 through 12 charge Harris, Feeney, and Michaud with violations of the MBTA because of the death of American widgeon; each count alleges the death of one bird.

Defendants attack the information on a number of points. This court will examine the challenge to the FIFRA counts first, then the attack on the MBTA, and finally the remaining pretrial motions.

## MOTIONS TO DISMISS THE FIFRA COUNTS

Defendants CFS, Harris and Michaud move to dismiss the FIFRA counts on the ground that the statute and the label are unconstitutionally vague in that they fail to describe the proscribed conduct sufficiently to enable affected persons to know in advance the activities they may legally pursue. Section 136j(a)(2)(G) of FIFRA provides:

(a) In general—

. . . . .

(2) It shall be unlawful for any person—

. . . . .

(G) to use any registered pesticide in a manner inconsistent with its labeling

. . . .

The label on the pesticide applied to Feeney's field states in pertinent part:

For water fowl protection do not apply . . . on fields where water fowl are known to repeatedly feed.

This quote from the label appears in the briefs of the United States and the defendants, not in the information. Since the parties agree on the quotation, this court will assume that it is correctly quoted.

█ The vagueness doctrine is essentially a reflection of

"[t]he underlying principle . . . that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."

*Colten v. Kentucky*, 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972), *quoting United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). The *Colten* Court added:

The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.

*Id.* Two justifications support the vagueness doctrine. First, vague laws trap the innocent—it is essential that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Second, vague laws impermissibly delegate policy decisions as to what is prohibited to police, judges and juries for resolution on an ad hoc basis with the danger of arbitrary and discriminatory application—laws must "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972).

█ In evaluating whether a statute is void for vagueness, the court should not be too demanding. In *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32–33, 83 S.Ct. 594, 597–98, 9 L.Ed.2d 561 (1963), holding that the words "unreasonably low prices" in the Robinson-Patman Act were not vague, the Court stated:

The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language. [citations] Indeed, we have consistently sought an interpretation which supports the constitutionality of legislation. [citations] Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed. [citations] In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged.

Thus, if people of ordinary intelligence "must necessarily guess at its meaning and differ as to its application," a statute is void for vagueness. *Id.*

Defendants CFS and Harris point out that at least some of the words or phrases challenged as vague are part of the label rather than the statute itself. Since the label was written by the manufacturer and submitted to the EPA for approval, defendants urge that it is not entitled to the presumption of validity that attaches to a congressional enactment. FIFRA provides that a manufacturer seeking registration of a pesticide must file a complete copy of the label with the EPA. 7 U.S.C. § 136a(c)(1)(C). The Administrator of the EPA registers the pesticide if he determines that its label complies with the Act's requirements. *Id.* § 136a(c)(5)(B). If the label does not comply with the Act, the Administrator is required to deny registration. *Id.* § 136a(c)(6).

■ It is clear that the label itself was not enacted by Congress and is not entitled to the "strong presumptive validity" applicable to congressional action. The label was, however, examined by the Administrator under the procedures set forth by Congress. The label should be accorded a presumption of validity like that attaching to an administrative regulation adopted pursuant to power granted by Congress. *E. g., Ramirez v. Immigration and Naturalization Service,* 550 F.2d 560, 563 (9th Cir. 1977); *United States v. Boyd,* 491 F.2d 1163, 1167 (9th Cir. 1973). It may be that the label, written as it was by a private manufacturer, should not be accorded the full measure of presumptive validity that would attach to a regulation prepared by the agency itself, but the Act requires the Administrator to examine such labels and determine their conformity to the Act. This court will not assume that the Administrator failed to carry out his responsibilities. Accordingly, this court will presume that the label is valid, giving substantially the same weight to that presumption as it would to a regulation.

Defendants attack the statute itself and the labeling on a number of grounds, each testing a particular word or phrase for vagueness. This court will examine each of these contentions seriatim, applying the vagueness doctrine as set forth in the Supreme Court decisions above.

(1) "inconsistent with its labeling"

■ Defendant Michaud asserts that the FIFRA prohibition on the use of a pesticide "in a manner inconsistent with [its labeling]" is vague because of the word "inconsistent." It is difficult to discern the source of the asserted vagueness. Both Black's Law Dictionary and Webster's Dictionary define "inconsistent" to mean "contrary to" or "incompatible with." It is clear enough that, if one applies a pesticide in a way contrary to the directions on the label, one has violated the statute. The legislative history of this provision includes some discussion of the word "inconsistent."

[I]t is the belief of the Committee that the use of the word "inconsistent" should be read and administered in a way so as to visit penalties only upon those individuals who have disregarded instructions on a label that would indicate to a man of ordinary intelligence that use not in accordance with such instructions might endanger the safety of others or the environment. Thus, for example, it would be

expected that use of a general, unrestricted pesticide registered for use on enumerated household pests to exterminate a pest not specified on the label would not be inconsistent with the labeling. On the other hand, the use of even a general use pesticide in a manner inconsistent with a specified caution or restriction on the label should be considered inconsistent with the labeling.

S.Rep.No.838, *reprinted in* 1972 U.S.Code Cong. & Admin.News pp. 3993, 4008. Defendants here are charged with a use inconsistent with a specific instruction on the label. This court finds no unconstitutional vagueness in the word "inconsistent."

■ Michaud also states that the word "inconsistent" is vague when viewed in the context of the "four different labels in a very short time span" that he asserts have been used on this pesticide. It may be that there have been a number of different labels on the particular pesticide and even that the application of the pesticide might have been consistent with one or more of the labels. Even if true, the different labels are irrelevant. The question is whether the application was inconsistent with the labeling on the particular container(s) of pesticide applied to the field in this case. If Michaud seeks to find vagueness in the existence of more than one label, he must provide evidence as to what each of the labels stated, when the labels were used, and whether the application was inconsistent with one label but consistent with another. In the absence of that evidence, this court finds no vagueness in the word "inconsistent."

(2) "repeatedly feed"

■ Defendants CFS, Harris and Michaud urge that the words "repeatedly feed" are unconstitutionally vague. Analysis of this question must look to whether the words are vague on their face and whether the words are vague as applied to these defendants under the circumstances. On their face, the words are not vague; they encompass situations in which water fowl feed in an area with sufficient frequency and regularity as to permit one to say they repeatedly feed there. Certain cases are clearly within or clearly without the meaning of "repeatedly feed"; a field in which water fowl have fed only once or twice in the last 3 or 4 years would be recognized as outside the meaning by persons of ordinary intelligence while a field in which the birds feed morning and evening year round would be immediately recognized as within the meaning.

The harder question is whether the words "repeatedly feed" are vague as applied to these defendants. As in the *National Dairy Products* case, the words must be examined to determine whether they sufficiently warned these defendants that their conduct was within the prohibition. 83 S.Ct. at 598. The question is necessarily one of mixed law and fact; that is, how frequently did the water fowl feed in this field and is this frequency such as would be understood by the man of ordinary intelligence to fall within the meaning of the term "repeatedly." The United States has made an offer of proof as to the evidence relating to the frequency with which water fowl fed in the particular field and the general area. This offer includes the following: (1) at least one witness saw "a substantial quantity of birds" feeding in the field on March 14 through 16 and on March 20; the spraying took place on March 21; (2) duck damage in the field on March 22 is said to provide evidence that ducks had been feeding in the field for three to four weeks; (3) the defendants made statements concerning the prior presence of water fowl in the field; and (4) statistics which show the average water fowl population in March in the Sacramento National Wildlife Refuge, which is less than three miles from Feeney's field. United States' Brief, Sept. 30, 1977. There are certain questions raised by parts of the offer of proof as to admissibility and probative value, but the offer is sufficient to demonstrate that there is a real possibility that water fowl did feed repeatedly in the field.

A final decision on this question will require the taking of evidence; this evidence

could be heard at a preliminary hearing and it must be heard at the trial itself. F.R. Crim.P. 12(e) provides:

A motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected. Where factual issues are involved in determining a motion, the court shall state its essential findings on the record.

The Advisory Committee Notes to this Rule state that "subdivision (e) confers general authority to defer the determination of any pretrial motion until after verdict." The principles expressed by the case law and commentators indicate that this is a case in which deferral of the motion to dismiss on the ground that the words "repeatedly feed" are vague as applied would be appropriate. The evidence must necessarily be presented at the trial itself, and judicial economy would be served by avoiding an evidentiary hearing on the same evidence. *See, e. g., United States v. Treadway,* 312 F.Supp. 307 (E.D.Va.1970); *United States v. Fargas,* 267 F.Supp. 452 (S.D.N.Y.1967); 1 Wright & Miller, Federal Practice and Procedure: Criminal § 194. Accordingly, decision on whether the words "repeatedly feed" are vague as applied is deferred until the evidence has been received at the trial.

(3) "known to repeatedly feed"

Defendants' next challenge is to the word "known" in the label; they urge that the word is unconstitutionally vague in that it fails to indicate who must know that the water fowl repeatedly feed.

The concept of knowledge appears at two points; the label on the pesticide states that it is not to be used where water fowl are "known to repeatedly feed," and the criminal penalty section of FIFRA under which defendants are charged provides that a person "who knowingly violates any provision of this subchapter shall be guilty of a misdemeanor." 7 U.S.C. § 136*l*(b). The position of the United States is that the requirement "known to repeatedly feed" is

satisfied if anyone has knowledge of the repeated feeding, regardless of the individual defendants' knowledge. As to the word "knowingly" in section 136*l*, the United States urges that only general intent is required and that mens rea is satisfied by a showing that defendants knew they were dealing with a pesticide.

Defendants CFS, Harris and Michaud reject both positions. They assert that the words "known to repeatedly feed" must mean knowledge by the person who uses the pesticide: the person charged with violation of the statute. Moreover, defendants urge that the words "knowingly violates" in section 136*l* add support to the requirement of actual knowledge, and they seek to distinguish the cases cited by the United States.

As to the word "known" in the label, the United States argues:

this knowledge requirement has nothing to do with the individual state of mind or knowledge of the user. Instead it details the appropriate circumstances under which the pesticide can be applied. That the label prohibits the use of the pesticide in circumstances where *anyone* has knowledge of the existence of repeatedly feeding water fowl, irrespective of the individual user's knowledge is consistent with the label's use of the subjunctive words "are known" instead of language which would more precisely apply to a user's knowledge; as, for example, "Where you know that water fowl repeatedly feed."

United States Brief, Dec. 12, 1977, at 13. Defendants CFS and Harris read the label differently:

The person reading the label perceives it as an instruction addressed to himself. "For water fowl protection do not apply . . . on fields where water fowl are known to repeatedly feed." Read in this light, the wording suggests to the reader that he is to query himself, where he feels he has the requisite familiarity with the area, as to whether it is known that waterfowl repeatedly feed on the particu-

lar field. Perhaps the user who knows that he is unfamiliar with the area has a duty to inquire as to information known to the community, but the person who reasonably believes that he does know what is generally known in the community, is not required to burn back to town and make inquiries of other community members in order to determine the reputation of the field in the community. Defendants' CFS and Harris Brief, Nov. 22, 1977, at 7. This discussion appears to accept the use of a community knowledge standard with the requirement that the individual user have actual knowledge of that community knowledge. Defendants CFS and Harris imply that an individual could be guilty of a violation by application of a pesticide to a field generally believed by the community to be one in which water fowl fed repeatedly even if the individual himself knew that the commonly-held belief was incorrect. Defendant Michaud rejects both the interpretation of the United States and that of CFS and Harris. He argues that the United States must prove that he personally knew that water fowl repeatedly fed in the field in order to establish his guilt.

The parties cite only one case construing the word "known": *Lanzetta v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), which held the following statute unconstitutionally vague: "Any person not engaged in any lawful occupation, known to be a member of any gang . . . is declared to be a gangster." The Court found the words "known to be a member" ambiguous because it was not clear "whether that reputation must be general or extend only to some persons." *Id.* at 621. The case is of little assistance here because the word "known" definitely did not apply to personal knowledge of the person charged.

This court has considered the defendants' argument that the word "knowingly" in section 136*l* should be interpreted to increase the scienter requirement in this case.

The argument is without merit. The penalty provisions of section 136*l* were drafted in a general fashion to encompass the wide variety of possible violations of FIFRA. Congress did not contemplate the conjunction of the word "knowingly" with a label direction including the word "known." Instead, Congress was enacting a general provision, using the word "knowingly" as it had in the context of other statutes creating malum prohibitum crimes. The word was used to reflect the requirement that general intent be proved in order to establish a violation.

■ Although no relevant case law exists construing this particular statute, it clearly falls within the framework of other regulatory statutes. In *United States v. International Minerals & Chem. Corp.,* 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971), the Court examined the mens rea requirements applicable to a violation of a regulation of the ICC charged under 18 U.S.C. § 834(f) which provides that whoever "knowingly violates any such regulation" is guilty of a crime. The Court held that knowledge of the facts is required, that is, a general intent to do the actions constituting the violation, but that a specific intent to violate the law or a knowledge of the regulation is not a necessary element of the crime. The Court stated:

> dangerous or deleterious devices or products or obnoxious waste materials are involved, [and] the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation.

*Id.* at 1701–02. The mens rea requirement in the word "knowingly" would protect a person believing in good faith that he was dealing with distilled water rather than the corrosive liquids covered by the regulation. *Id.* at 1701. The same interpretation of the word "knowingly" has been applied in a number of other cases involving regulatory statutes and malum prohibitum crimes.[1] It

---

1. *E. g., United States v. Dotterweich,* 320 U.S. 277, 281, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943)

(legislation imposing penalties as a means to enforce regulatory purposes "dispenses with

is clear that the word "knowingly" in section 136*l* should be interpreted in the same fashion; it requires proof that the defendants knew they were dealing with a pesticide when they sprayed the field or caused it to be sprayed.

The more difficult question is the interpretation of the word "known" in the label. Certain types of proof would clearly be sufficient. If the United States could show actual personal knowledge arising from the defendants' own frequent sightings of water fowl in the field, there would be no dispute as to the application of criminal penalties. The same result should apply to proof of their actual knowledge of other evidence of the birds' presence, such as duck damage to the field. Similarly, proof that the defendants knew that others believed that water fowl repeatedly fed in the field should be sufficient. Such actual knowledge of the beliefs of others would put the defendants on notice that water fowl were in the field with at least some frequency; in such a case, the defendants would act at their peril if they did not examine the field prior to spraying.[2] Moreover, knowledge in this case cannot be limited to positive knowledge; it must include "the state of mind of one who does not possess positive knowledge only because he consciously avoided it." *United States v. Jewell,* 532 F.2d 697, 702 (9th Cir.) (en banc), *cert. denied,* 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976).[3]

Given that the types of proof above are obviously sufficient to justify a conviction for use of the pesticide in a manner inconsistent with the instruction not to apply it where water fowl are known to feed repeatedly, the statute as it incorporates the label is not vague on its face. The

the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." This case involved convictions for shipping misbranded and adulterated drugs); *United States v. Balint,* 258 U.S. 250, 257, 42 S.Ct. 301, 302, 66 L.Ed. 604 (1922); *Ellis v. United States,* 206 U.S. 246, 27 S.Ct. 600, 602, 51 L.Ed. 1047 (1907) (a defendant convicted of violations of a statute prohibiting a contractor's permitting workmen to work over eight hours a day argued that the word "intentionally" in the statute required knowledge of the law. The Court rejected the argument, stating: "If a man intentionally adopts certain conduct in certain circumstances known to him and that conduct is forbidden by the law under those circumstances he intentionally breaks the law in the only sense in which the law ever considers intent."). *See also United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (possession of a hand grenade); *United States v. Thomas,* 531 F.2d 419, 421–22 (9th Cir. 1976) (possession of a short barrel rifle); *United States v. DeBartolo,* 482 F.2d 312 (1st Cir. 1973) (transfer of a shotgun); *Sipes v. United States,* 321 F.2d 174 (8th Cir. 1963) (possession of a gun).

2. *See United States v. Balint, supra* at 302–03 (the defendant attacked the indictment for the sale of narcotics on the ground that it did not charge knowledge of the prohibited nature of the drugs. The Court held that the statute's purpose was "to require every person dealing in drugs to ascertain at his peril whether that which he sells comes within the inhibition of the statute, and if he sells the inhibited drug in ignorance of its character, to penalize him." The Court declared that, "in the prohibition or punishment of particular acts, the state may in the maintenance of a public policy provide 'that he who shall do them shall do them at his peril and will not be heard to plead in defense good faith or ignorance.' "), *quoting Shevlin-Carpenter Co. v. Minnesota,* 218 U.S. 57, 69, 30 S.Ct. 663, 666, 54 L.Ed. 930 (1910).

3. The *Jewell* court discussed the concept of deliberate ignorance as the equivalent to actual knowledge at length, stating in part:

deliberate ignorance and positive knowledge are equally culpable. The textual justification is that in common understanding one "knows" facts of which he is less than absolutely certain. To act "knowingly," therefore, is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question. When such awareness is present, "positive" knowledge is not required.

*United States v. Jewell, supra* at 700. The *Jewell* case involved a defendant who brought marihuana into the United States in a secret compartment in the car. He testified that a stranger paid him $100.00 to drive the car across the border, that he saw the void in the trunk where the secret compartment was, but that he did not examine the trunk or the compartment to determine what was in it. Under these circumstances, the court held that the defendant could not assert a lack of knowledge within the meaning of the statute.

United States seeks, however, to apply a broader construction of the word "known" to include knowledge by anyone, not necessarily including the individual defendants here. It is that construction which defendants assert would be unconstitutionally vague. The United States' interpretation goes too far; if the defendants reasonably believed that water fowl did not repeatedly feed in the field, then the fact that some other person unknown to the defendants believed that water fowl repeatedly fed in the field should not be a basis for conviction. The central concept is reasonableness. For example, in *United States v. Balint,* 258 U.S. 250, 252, 42 S.Ct. 301, 302, 66 L.Ed. 604 (1922), the defendant appealed his conviction for sale of narcotics, claiming in part that he did not know what he was selling. The Court declared:

> where one deals with others and his mere negligence may be dangerous to them, as in selling diseased food or poison, the policy of the law may, in order to stimulate proper care, require the punishment of the negligent person though he be ignorant of the noxious character of what he sells.

■ The means were present whereby the defendants could determine whether water fowl had been feeding repeatedly in the field and an unreasonable failure to do so cannot free them from liability.[4] However, a final ruling on the nature of the knowledge requirement in the word "known" as applied to these defendants must be deferred until after evidence has been received on the extent of their knowledge, their ability to determine the facts, and the reasonableness of their actions given the facts. Once that evidence has been taken, it can be determined whether the label's language would necessarily be vague as applied to these defendants under the circumstances in which they acted. It may be that the proof amassed by the United States will satisfy the standards discussed above as to the types of proof that would clearly be sufficient. If so, a ruling on the constitutionality of applying criminal penalties to persons with less knowledge would be unnecessary. At this point, it is sufficient to state that the knowledge requirement falls between the position argued by the United States and the position offered by defendant Michaud.

(4) "to use any registered pesticide"

■ The defendants also challenge the interpretation that the United States seeks to apply to the word "use" in 7 U.S.C. § 136j(a)(2)(G) which makes it illegal "to use any registered pesticide in a manner inconsistent with its labeling." Defendants CFS and Harris urge that the word "use" cannot be interpreted to apply to the dealer that sells the pesticide and the adviser who merely advises a farmer with respect to it because a third party, either the farmer or the pesticide applier, is the "user." The United States offers little briefing on this question, contending that it is inappropriate to raise it prior to trial because it involves factual questions. The United States' position is incorrect; defendants argue that the statute cannot be applied to impose criminal penalties on persons other than the actual users of the pesticide. The legal question as to the definition of the word "use" and the asserted unconstitutional vagueness in imposing criminal penalties on those who sell a pesticide or provide advice concerning its properties is properly before the court on a motion to dismiss.

The word "use" is not defined in the Act itself, but the EPA has defined it by regulation:

> The term "use" means any act of handling or release of a pesticide, or exposure of man or the environment to a

---

4. *E. g., Riss & Co. v. United States,* 262 F.2d 245, 250 (8th Cir. 1958) (in reviewing the conviction of a carrier for permitting drivers to exceed the maximum permitted driving time, the court noted that the excess hours were readily discoverable upon inspection of the logs and that the defendant's employees denied discovery of the violations until months after their commission. The court held: "the means were present by which the defendant could and would have detected the infractions and its failure to do so under the existing circumstances cannot, as contended, absolve it of liability as a matter of law.").

pesticide through acts, including but not limited to:

(1) Application of a pesticide, including mixing and loading and any required supervisory action in or near the area of application;

(2) Storage actions for pesticides and pesticide containers; and

(3) Disposal actions for pesticides and pesticide containers.

[Use as defined here incorporates application . . .. Many aspects of use do not include application (e. g., storage, transportation) . . ..]

40 C.F.R. § 162.3(*oo*) (1976) (brackets in original). This definition has been adopted by the Office of Enforcement in the enforcement of pesticide labeling violations under section 136j(2)(a)(G). *See* Pesticide Enforcement Policy Statement No. 7, 42 Fed.Reg. 21496 n.2 (Apr. 27, 1977). EPA policy statements indicate by implication that the word "use" is not meant to apply to a pesticide dealer or adviser merely because of the sale or giving of advice:

> FIFRA enforcement liability for the misuse of pesticides falls primarily upon the pesticide user or applicator. Particularly where the pesticide application involves a deviation from the uses which are allowed on the accepted label, any person who mixes, loads, applies, stores, or disposes of any registered pesticide in a manner inconsistent with its labeling may be subject to civil or criminal sanctions under FIFRA.

Pesticide Enforcement Policy Statement No. 5, 41 Fed.Reg. 41142, 41146 (Sept. 21, 1976). The deviation referred to in this quotation is the use of a pesticide against a pest not named as one for which the pesticide is to be used. As defendants CFS and Harris point out, the word "use" could properly be applied to a pesticide seller who stores the pesticide in a manner inconsistent with the label or who spills it and fails to dispose of the spill properly.

■■■■ The United States does not dispute defendants' interpretation of the word "use"; instead, it points to 18 U.S.C. § 2, the aiding and abetting statute, as the source of criminal liability on the part of defendants CFS and Harris. This court has considered the possible interpretations of the word "use" and finds that a person who sells a pesticide, without more, cannot be said to "use" the pesticide in a manner inconsistent with its label on the grounds that the buyer is guilty of inconsistent use. The opposite interpretation would make the seller strictly liable for criminal sanctions because of the violations of its buyers. The same rule applies under 18 U.S.C. § 2; a mere seller cannot be criminally liable for the inconsistent use of a pesticide as an aider and abetter simply because of the sale itself.

In this case, however, the seller CFS employed Harris, a pesticide adviser, and the United States' offer of proof includes the following:

> (1) that Harris, a licensed pesticide adviser, offered Feeney [the field owner] a selection of pesticides, including Furadan, from which Feeney made his selection, (2) that Harris inspected the field on March 12 or 13 and at that time advised Feeney to irrigate it before the Furadan was applied so that there would not be a run-off with a resulting fish kill, (3) that Harris visited the field on March 18 after it had been irrigated, but did not get out of his motor vehicle to inspect the field, (4) that Harris delivered 14 gallons of Furadan and his recommendations as to use to Michaud [the applicator], and said recommendations did not include any warning against the use of Furadan where waterfowl might be endangered.

United States' Brief, Sept. 30, 1977, at 4. This offer of proof directly raises the question whether Harris and, through Harris, CFS could be criminally liable under 18 U.S.C. § 2.

> The aiding and abetting statute provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

18 U.S.C. § 2(a).[5] Section 136*l*(b)(4) of FIFRA provides:

> When construing and enforcing the provisions of this subchapter, the act, omission, or failure of any officer, agent, or other person acting for or employed by any person shall in every case be also deemed to be the act, omission, or failure of such person as well as that of the person employed.

There is no dispute that Harris was employed by CFS; accordingly, if Harris is liable directly or under the aiding and abetting statute, then CFS is also liable by virtue of section 136*l*(b)(4).

The question, then, is whether Harris can be prosecuted for the violation arising from the inconsistent "use" of the pesticide either on the ground that he was sufficiently involved in the selection and application of the pesticide that he may be deemed to have "used" it or on the ground that he aided and abetted in the "use." As the United States points out, these questions involve the proof that will be presented at trial and cannot be fully resolved at this point in the prosecution. Certain aspects of the questions, however, involve purely legal decisions and can be resolved at this time.

 The first of these legal questions is whether one who advises as to the use of a pesticide can be deemed to "use" the pesticide within the meaning of the Act. The EPA interpretation of the statute indicates that an adviser who is significantly involved in the use of a pesticide can be a "user" for purposes of criminal liability. In a 1977 policy statement, the EPA states:

The responsibility for the safe and efficacious aerial application of the pesticide . . . may rest with either the applicator or the knowledgeable expert or both, as the equities and the circumstances may require. FIFRA enforcement liability for the misuse of pesticides falls primarily upon the pesticide user or applicator, and not upon the knowledgeable expert who has recommended such use. . . . [T]he expert who recommends and personally supervises the aerial application of [a pesticide not labeled for aerial application but meeting the requirements specified in the statement] is himself considered to "use" the pesticide within the meaning of FIFRA section [136j](a)(2)(G), and is, thus, subject to FIFRA enforcement liability for any misuse of the pesticide which occurs under his supervision.

Pesticide Enforcement Policy Statement No. 7, 42 Fed.Reg. 21496, 21499 (Apr. 27, 1977). This interpretation is entitled to great weight. *E. g., Brubaker v. Morton,* 500 F.2d 200, 202 (9th Cir. 1974) ("A court faced with a problem of statutory construction should give great deference to the interpretation of a statute by the officers or agency charged with its administration."); *see Hart v. McLucas,* 535 F.2d 516, 520 (9th Cir. 1976). This court finds no basis on which to reject the EPA interpretation. One who is personally involved in recommending the use and supervising or overseeing the circumstances of the use of a pesticide cannot, as a matter of law, escape criminal liability for the use of a pesticide in a manner inconsistent with its label on the ground that he did not himself use the

---

**5.** Section 2(b) of the aiding and abetting statute provides:

> Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2(b). Defendants CFS and Harris argue, by implication that this subsection is the only applicable portion of section 2; they state that willfulness is an element of proof. The word "willfully" appears only in subsection (b). Subsection (b) is inapplicable here; it applies to one who causes an illegal act to be performed by another and there is no requirement

that the actor be guilty of criminal intent. *United States v. Rapoport,* 545 F.2d 802, 806 (2d Cir. 1976). Under subsection (a), however, the principal and the aider and abetter must both have the requisite criminal intent. *Id.* Subsection (a) is the applicable section under the circumstances of this case; the mens rea requirements for conviction under subsection (a) are discussed in the text. As a final matter, it should be noted that there is no requirement that 18 U.S.C. § 2 be stated in the information because it is embodied in every federal indictment or information. *United States v. Maselli,* 534 F.2d 1197, 1200 (6th Cir. 1976).

pesticide. At the other extreme one who has no personal knowledge of the location where the pesticide is to be used and merely answers a farmer's query about available pesticides by stating that there are five pesticides authorized for a particular use would not be criminally liable. Thus, whether a particular adviser can be criminally liable for an inconsistent use· of a pesticide which he has advised another to use depends on the extent of the adviser's personal involvement in the application of the pesticide and knowledge of the facts surrounding that application. Defendants' assertion that an adviser cannot be criminally liable, as a matter of law, is incorrect.

The other legal question presented by the defendants in connection with whether Harris can be prosecuted for a "use" inconsistent with the label concerns the nature of the scienter requirement. Defendants urge that the United States must demonstrate that Harris actually knew that water fowl repeatedly fed in the particular field. As discussed earlier, actual personal knowledge is not required. At the least, deliberate ignorance would be sufficient. The earlier discussion of the knowledge requirement in the word "known" is applicable here, and defendants are incorrect in their interpretation that the statute and label require actual knowledge.

■■■■ As a final matter, the parties raise questions concerning the mens rea requirements for conviction as an aider and abetter under 18 U.S.C. § 2(a). The defendants urge that the violation must be willful, while the United States argues that no higher state of mine is required for an aider and abetter than is required for a principal.[6] The Ninth Circuit has discussed the nature of the scienter requirement for aiding and abetting in two recent cases that are relevant here. In *United States v. Short,* 493 F.2d 1170 (9th Cir.), *unrelated motion granted,* 500 F.2d 676 (9th Cir.), *cert. de-*

*nied,* 419 U.S. 1000, 95 S.Ct. 317, 42 L.Ed.2d 275 (1974), the court held:

> It is the aider and abettor's state of mind, rather than the state of mind of the principal, that determines the former's liability. . . . "[An] aider and abettor is made punishable as a principal . . and the proof must encompass the same elements as would be required to convict any other principal."

*Id.* at 1172, *quoting Hernandez v. United States,* 300 F.2d 114, 116 (9th Cir. 1962). In *United States v. McDaniel,* 545 F.2d 642 (9th Cir. 1976), a felon was convicted of transporting firearms and his wife was convicted of aiding and abetting. The jury asked whether one could be convicted of aiding and abetting without knowledge that a crime was being committed, and the judge answered "yes." The Ninth Circuit reversed, stating:

> Presumably, the court interpreted the jury's question as asking whether the aider and abetter must know that the activity was a crime. It is true that ignorance of the law is no excuse, but the jury's question was not that simple. . . .

> The *mens rea* of aiding and abetting is "guilty knowledge." *Grant v. United States,* 291 F.2d 746, 749 (9th Cir. 1961). Barbara, in order to be found guilty, must at least have assisted Ulysses in the transportation of the firearms knowing that he was transporting firearms. We said recently that one acting with "criminal intent and design to assist the perpetrators" is guilty of aiding and abetting. *United States v. Lane,* 514 F.2d 22, 27 (9th Cir. 1975). *But see Weedin v. United States,* 380 F.2d 657, 660 (9th Cir. 1967). A defendant to be an aider and abetter must know that the activity condemned by the law is actually occurring and must intend to help the perpetrator. R. Perkins, Criminal Law 645 (1969). By its answer to the jury's question, the

---

6. Defendants point out that the United States cited to and provided a copy of a Ninth Circuit decision marked "Do Not Publish" in support of this position. The Ninth Circuit Rules forbid the use of such decisions as precedent in other cases. Although this court is unwilling to term

the United States action a misconduct, it was improper to cite that decision or to attempt to accord it precedential value. This court did not consider that decision in any respect in reaching its own decision on the law applicable to this case.

court could have caused the jury to disregard the requisite scienter elements which the jury had to find in order to convict Barbara.

*Id.* at 644. From these and related cases, it is clear that the aider and abetter need not know that the activity constitutes a crime but must know the facts essential to constitute the activity a crime. Applying the law reflected in these cases to this case, the United States must show the same extent of knowledge on the part of Harris as aider and abetter as it must show to obtain a conviction as a principal. The scienter requirement for an aider and abetter in *McDaniel* was that she know that firearms were being transported; here the requirement is that Harris know that he was dealing with a pesticide. Moreover, the United States must establish the same extent of knowledge as to the repeatedly feeding water fowl for an aider and abetter as is required for a principal. The only difference is that Harris need not be shown to have "used" the pesticide; he need only have aided and abetted that use.

(5) "acting for or employed by"

As a final matter, defendants challenge the Government's interpretation of principal-agent liability provided in section 136*l*(b)(4). That section provides:

> When construing and enforcing the provisions of this subchapter, the act, omission, or failure of any officer, agent, or other person acting for or employed by any person shall in every case be also deemed to be the act, omission, or failure of such person as well as that of the person employed.

7 U.S.C. § 136*l*(b)(4). The parties are agreed that this section permits the imposition of criminal liability on CFS upon a determination that its employee Harris is subject to criminal liability. The dispute over the interpretation of section 136*l*(b)(4) arises from the United States' position that Michaud, the applicator, can be viewed as a person "acting for" both CFS and Feeney in applying the pesticide so that the criminal liability of CFS and Feeney can be found in the acts or omissions of Michaud. Defend-

ant Feeney, the field owner, states that Michaud was acting as an independent contractor in spraying the field, but Feeney does not dispute that Michaud might be proved to have "acted for" Feeney. Thus, the central question is whether the language in section 136*l*(b)(4) permits the interpretation sought by the United States: that Michaud was "acting for" CFS.

The language of section 136*l*(b)(4) was taken directly from section 135f(d) of FIFRA, enacted in 1947, which remains in force with the additional regulation imposed by section 136 *et seq.* No published opinion construes the meaning of section 135f(d) or section 136*l*(b)(4). The parties have not cited any legislative history or administrative interpretation of those sections, and this court has been unable to discover any relevant information from those sources. An examination of other criminal provisions of Title 7 reveals that similar language appears in at least six other statutes; these provisions, however, have one difference in that they specify that the person "acting for or employed by" another person is "within the scope of his employment." For example, section 87d of the United States Grain Standards Act provides:

> When construing and enforcing the provisions of this chapter, the act, omission, or failure of any official, agent, or other person acting for or employed by any association, partnership, or corporation within the scope of his employment or office shall, in every case, also be deemed the act, omission, or failure of such association, partnership, or corporation as well as that of the person.

7 U.S.C. § 87d. *See also id.* §§ 4, 63, 153, 223, 473c–3. This distinction may indicate a greater liability of an employer under the two FIFRA criminal provisions in that they do not require that the person employed by or acting for another person be acting within the scope of his employment, but it offers little assistance in determining the nature of the words "acting for." No cases could be found that have construed the "acting for" portion of these six sections of Title 7.

The similar provisions in other Titles also failed to offer guidance for the interpretation of section 136*l*(b)(4); minor differences in the formulation of the provisions did not permit meaningful inferences and again no relevant case law could be found. *See* 21 U.S.C. §§ 63, 461, 1041(a); 47 U.S.C. § 217.

Accordingly, this court must determine the meaning of the words "acting for" in section 136*l*(b)(4) without the assistance of legislative history, administrative interpretation or prior case law. This determination is made within the framework set forth in the decisions of other courts faced with the same problem: a criminal statute should be strictly construed and any ambiguities should be resolved in favor of lenity. *E. g., United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 1015, 35 L.Ed.2d 379 (1973); *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971). It is the opinion of this court that, in applying the pesticide, Michaud was "acting for" Feeney because Michaud was applying the pesticide to Feeney's field for Feeney's benefit and was paid by Feeney. The fact that Michaud is said to have been an independent contractor rather than an employee is of no significance here because the section uses the disjunctive "acting for *or* employed by." Similarly, Harris was acting for or employed by CFS within the meaning of the section; the briefs of CFS, Harris and the United States all agree that Harris was employed by CFS.

The relationship between CFS and Michaud is more difficult. The United States argues that Michaud was "acting for" CFS in applying the pesticide. It appears from the briefs that Feeney selected Michaud as the person to apply the pesticide and that Harris or CFS delivered the pesticide to Michaud with certain instructions for its use. This relationship, standing alone, is insufficient to establish that Michaud was "acting for" CFS or Harris. One who purchases a product or uses a product purchased by another cannot be said to be "acting for" the seller of the product based solely on that use. Some additional relationship between the user

and the seller must be shown. It may be proof at trial could establish the existence of that additional relationship. At this point, however, it is clear that, as a matter of law, the words "acting for" do not encompass a pesticide applicator whose only relationship with the seller of the pesticides is that he applies them to the field for the benefit of the owner of that field as the independent contractor of the owner. The fact that CFS cannot be held liable under section 136*l*(b)(4) for the acts of Michaud solely because CFS sold the pesticide does not indicate that the FIFRA count against CFS should be dismissed. CFS may be liable for a FIFRA violation based on the actions of its employee Harris, either under the aiding and abetting statute or under section 136*l*(b)(4).

This question of principal-agent liability under section 136*l*(b)(4) is the final question raised by the defendants in connection with their motion to dismiss the FIFRA counts. Although this court has rejected certain interpretations of the statute asserted by the United States, those decisions do not justify dismissal of the FIFRA counts as to any of the defendants. The provisions of FIFRA and the language of the label are not unconstitutionally vague on their face; whether the words "repeatedly" and "known" are vague as applied cannot be determined until after evidence is taken, and decision on those two questions is deferred until after trial. Defendants' motion to dismiss is denied.

## MOTIONS TO DISMISS THE MBTA COUNTS

In addition to alleging violation of FIFRA, the information charges defendants, Feeney, Harris and Michaud with ten counts for violation of the Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 703 *et seq.* Each count charges the death of a single American widgeon, a bird protected under the MBTA. Defendants raise several grounds for dismissal of these counts, and the court will examine them seriatim.

## (1) Multiplicity

▮ Defendants argue that multiple counts are charged improperly for a single transaction. The parties are agreed that there was only one application of pesticide. Defendants argue that, if there is only one act, there can be only one count charged no matter how many birds are killed by that act. The United States responds that each death is a separate violation of the statute so that separate counts are proper.

Section 703 of the MBTA provides in part:

Unless and except as permitted by regulations made as hereinafter provided in sections 703 to 711 of this title, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, or any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or in part, of any such bird or any part, nest, or egg thereof, included in the terms of the conventions [for the protection of migratory birds].

The penalty provision of the MBTA provides in part:

Except as otherwise provided in this section, any person, association, partnership, or corporation who shall violate any provisions of said conventions or of sections 703 to 711 of this title . . . shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $500 or be imprisoned not more than six months, or both.

16 U.S.C. § 707(a). The question to be decided is what is the "unit of prosecution" intended by Congress—each dead bird or each act resulting in the death of one or more birds?

Historically, it appears that defendants have been charged with only one count even when more than one bird was involved, although in certain cases the United States has treated all the birds killed on one day as one count and charged multiple counts because violations occurred on more than one day. For example, in *Rogers v. United States,* 367 F.2d 998 (8th Cir. 1966), no challenge was raised on multiplicity grounds even though the first count charged the unlawful sale of four ducks on January 23, 1964, the second charged the unlawful sale of one duck and two geese on November 11, 1964, the third charged the unlawful sale of 39 ducks and 20 geese on January 12, 1965, and the fourth charged unlawful possession of more than the prescribed limit of ducks and geese. In a few cases, it is not clear from the opinion how the counts were drawn; in *United States v. Gigstead,* 528 F.2d 314 (8th Cir. 1976), three counts charged the unlawful possession of protected birds but the decision does not explain whether three different dates of possession or three birds on the same date were alleged.

Recently, however, there has been a change in the enforcement of the MBTA, and multiple counts have been charged in circumstances similar to those in this case. The United States provided copies of certain recent decisions involving multiple counts, but these decisions are of negligible precedential value because the propriety of multiple counts was not raised.[7] At best, these case demonstrate that the United States has begun to charge multiple counts

---

**7.** *E. g., United States v. Equity Corp.,* Cr. 75–51 (D.Utah, Dec. 8, 1975) (defendant was charged with 14 counts for the death of 14 ducks arising from the failure to build oil sump pits in such a way as to keep ducks out; a motion to dismiss did not raise the multiplicity of counts question and defendant pled guilty and was fined the maximum $7000.00); *United States v. Stuarco*

*Oil Co.,* 73–CR–129 (D.Colo., Aug. 17, 1973) (defendant was charged with 23 counts for the death of each of 23 birds. Defendant's motion to dismiss did not raise the multiplicity of counts question; it was denied and defendant pled nolo contendere to 17 counts and the others were dismissed).

in cases of this type in which defendants have taken only one action resulting in the death of more than one bird. The United States also cites one case in which the question was raised tangentially: *United States v. FMC Corp.,* 428 F.Supp. 615 (W.D.N.Y. 1977). The bird deaths in this case resulted from birds drinking waste water from the defendant's production of pesticides poured into a lagoon. In *FMC Corp.,* the counts were charged by species—for example, count 1 was for the death of approximately 26 Canadian geese on April 23, 1975, count 2 was for the death of approximately 12 migratory ducks on the same date, and count 7 was for the death of one Canadian goose on May 7, 1975. The defendant sought a bill of particulars to determine whether a single course of conduct resulted in all the deaths; defendant then urged that a single course of conduct can result in only one offense under the Act. The court ruled against the defendant, apparently from the bench, and the case went to trial and the defendant was found guilty on some counts but not guilty on others.

It appears that the court found multiple counts were proper because the defendant was tried on all the counts and found guilty on a number of them. In the published decision, which concerns defendant's motions to suppress and for a jury trial, the court queried: "If 1,000 birds had been found dead at the lagoon, would defendant be subject to a $500.00 penalty for each? It may well be appropriate to have a different unit for sentencing." *Id.* at 617 n. 2. This comment implies that the court considered each bird death to be the appropriate "unit of prosecution" although not the appropriate "unit for sentencing." In the absence of a written opinion on this issue, this court is unable to find precedential value in the *FMC Corp.* decision. Defendants here argue that *FMC Corp.* was correct in combining all deaths within a single species on a single day into one count. Although it is true that the defendant in *FMC Corp.* was so charged, the case offers no support for the proposition that the Act requires that approach. The court made no decision on that point because it was not raised.

Defendants' primary argument is the Congress did not intend that prosecutions should be brought separately for each bird death. They state that the "unit of prosecution" is the action resulting in the bird death or deaths. Defendants discuss analogous cases which they argue establish that multiple counts are improper, and they use the legislative history of the MBTA to demonstrate their interpretation of the congressional intent.

In *Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), the defendant was convicted of two counts under the Mann Act for the simultaneous transportation of two women across a state line. The Supreme Court held that, although Congress could declare that simultaneous transportation of two women would constitute two violations, Congress had not done so clearly. The Court held that criminal statutes are to be read "with the saving grace of common sense" but that "if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses . . . ." *Id.* at 622. In *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952), 32 counts were charged for violations of the Fair Labor Standards Act; counts 1 through 6 alleged minimum wage violations, one per week for six weeks; counts 7 through 26 charged overtime pay violations, one per week for 20 weeks; and counts 27 through 32 charged record keeping violations, two each for two employees. The district court dismissed all but three counts, holding that the course of conduct rather than the separate actions within the course of conduct constituted the offense. The Supreme Court affirmed. Defendants cite the following language in the Supreme Court's decision:

> when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.

*Id.* at 229. The Court ruled, however, that a decision as to the proper "unit of prosecu-

tion" must be made with reference to congressional intent in the particular statute and stressed the fact that each problem of statutory construction is unique. This case provides the approach to be taken when congressional intent is not clear, but it offers little guidance for the construction of the penalty provisions of the MBTA.

 The defendants and the United States cite a variety of other cases from which they seek to draw analogies applicable to the instant case.[8] An examination of these cases confirms the approach taken in the *Universal C.I.T.* case: the critical factor is congressional intent but, when that intent is not expressed clearly and without ambiguity, a "rule of lenity" requires that doubts be resolved against multiple counts.[9] Accordingly, this court will examine congressional intent in the MBTA within the analytical framework set forth in *Universal C.I.T.*

 Looking first at the language of the MBTA itself, it is clear that Congress intended to make the unlawful killing of even one bird an offense. Section 703 and section 707 both use the words "*any* migratory bird," and section 703 adds the words "any part, nest, or egg of any such *bird.*" Section 703 was amended in 1974 to remove the words "any part, nest, or egg of any such *bird[s]*" and place in their stead the present language. Act of June 1, 1974, Pub.L.No.93–300, § 1, 88 Stat. 190. The primary purpose of that amendment was to amend the Act to conform the Act to the terms of the convention with Japan adopted on March 4, 1972. The change from plural to singular was made apparently to conform to the similar language in other sections of the Act, not to alter the substantive meaning of section 703. Both before and after the amendment, section 703 prohibited the killing of "any migratory bird." [10] Sec-

8. *E. g., Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (this decision would prevent a second prosecution for other birds killed by the application of pesticide if defendants were acquitted of the charges that they killed the 10 birds charged in this information, but it is not relevant to the question before this court); *Ladner v. United States,* 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958) (following the same analysis as *Universal C.I.T.*), questioned, *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975) (Stewart & Douglas, Js., dissenting) (the question is directed to the particular holding of *Ladner,* not the analytical approach); *United States v. Maude,* 156 U.S.App.D.C. 378, 481 F.2d 1062 (1973). Of particular relevance is *United States v. Alexander,* 152 U.S.App.D.C. 371, 471 F.2d 923 (1972, as amended, 1973), cert. denied, 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1972), in which the court declared that

the critical factor is the intent of Congress. In addition, where the language of the statute or the statutory scheme in general does not fix the punishment "clearly and without ambiguity," a "rule of lenity" requires that courts resolve doubts about congressional intent against "turning a single transaction into multiple offenses."

*Id.* at 931, *quoting Bell v. United States, supra.*

9. The United States seeks to distinguish the cases cited by defendants on the ground that they all involve violations involving a specific intent, in contrast to the instant case. Defend-

ants strongly dispute the assertion that the MBTA does not require specific intent, a ground for dismissal discussed *infra,* and they point out that in some of their cases specific wrongful intent is not an element of the crime. The United States argument is inapplicable; an examination of the Fair Labor Standards Act involved in the *Universal C.I.T.* case reveals that specific intent was not an element of the violations there.

10. As defendants point out, the word "any" has frequently appeared in statutes found to be ambiguous as to the unit of prosecution. In *United States v. Kinsley,* 518 F.2d 665 (8th Cir. 1975), the court noted:

Significantly, in many of the cases in which the courts have found a *Bell*-type ambiguity, the object of the offense has been prefaced by the word "any." Seemingly this is because "any" may be said to fully encompass (*i. e.,* not necessarily exclude any part of) plural activity, and thus fails to unambiguously define the unit of prosecution in singular terms.

*Id.* at 667, *citing inter alia United States v. Deaton,* 468 F.2d 541, 545–56 (5th Cir. 1972), cert. denied, 410 U.S. 934, 93 S.Ct. 1386, 35 L.Ed.2d 597 (1973) ("the use . . . of the adjective "any" and a singular noun and pronoun ['. . . conceals any prisoner after his escape'] is not sufficient authority for a judicial pronouncement that Congress clearly intended that the number of sentences a man may be given for a single course of action of conceal-

tion 703 makes it clear that killing a single bird is sufficient to create criminal liability; the section does not, however, indicate that killing more than one bird constitutes more than one criminal offense. Standing alone, the language could be interpreted either way. In such a case, the court should examine congressional intent.

The MBTA was enacted originally in 1918 to implement the provisions of a 1916 convention between the United States and Great Britain. The purpose of that convention was one "of saving from indiscriminate slaughter and of insuring the preservation of such migratory birds." 1916 Convention Preamble, *reprinted in* H.R.Rep.No.243, 65th Cong., 2d Sess. 3 (1918). Since then, the Act has been amended to implement two other conventions: the 1936 convention with Mexico which states its purpose is to protect the named species of migratory birds "in order that the species may not be exterminated," 1936 Convention Preamble, 50 Stat. 1311, and the 1972 convention with Japan entered into "to cooperate in taking measures for the management, protection, and prevention of the extinction of certain birds." 1972 Convention Preamble, TIAS No. 7990 (Mar. 4, 1972). The 1972 convention states that protection of migratory birds is desirable because "birds constitute a natural resource of great value for recreational, aesthetic, scientific, and economic purposes." *Id.* The language of the conventions supports the conclusion that Congress was concerned with protecting each bird; this conclusion is particularly supported by the concern over extinction of whole species because the loss of even a few birds might spell the end of the species.

The United States argues that the manifest concern over the possible extinction of whole species indicates that severe penalties should be visited upon those whose actions cause the death of many birds, endangering the species. This is an appealing argument—the person who kills many birds

should logically be subjected to more severe penalties than the person who kills only one bird. Congress, however, did not express itself clearly on this point. Despite the discussions in the legislative history concerning the fear that other species would follow the passenger pigeon into extinction, the legislative history of the Act does not demonstrate that Congress contemplated multiple counts for a single act in violation of the Act.

The most serious questions about the United States interpretation of the Act are raised by the 1960 Amendments. The original penalty provision in the Act created a misdemeanor for a violation of the Act with a fine of $500.00 or imprisonment for six months or both; the provision was very similar to the language of section 707(a) under which these defendants are charged. In 1960, Congress amended section 707 to create a felony with a fine of $2000.00 and imprisonment of two years or both for persons who take migratory birds with intent to sell or barter or who sell or barter migratory birds. 16 U.S.C. § 707(b). In addition, the amendment provided for forfeiture of the guns, nets and other equipment, and the vehicles, vessels and other means of transportation used by a person engaged in the taking, killing or pursuing of migratory birds with intent to sell or barter. *Id.* § 707(c). The Senate Report prepared in connection with the 1960 Amendments states that they were necessary because

[u]nder existing law, an individual who hunts migratory birds for pleasure and who takes one more bird than the limit, or who hunts a few minutes before or after sunset, is liable to the same penalties as a person who slaughters these wildfowl for commercial purposes as a means of livelihood.

· · · · ·

This bill would authorize more severe penalties for these market hunters and

ment could be determined by adding up the number of escapees concealed"); *Parmagini v. United States*, 42 F.2d 721 (9th Cir. 1930), *cert. denied*, 283 U.S. 818, 51 S.Ct. 344, 75 L.Ed. 1314 (1931); *United States v. Melville*, 309

F.Supp. 774 (S.D.N.Y.1970); *and United States v. Martin*, 302 F.Supp. 498 (W.D.Pa.1969), *aff'd*, 428 F.2d 1140 (3d Cir.), *cert. denied*, 400 U.S. 960, 91 S.Ct. 361, 27 L.Ed.2d 269 (1970).

would provide for forfeiture of guns and equipment used by such persons if they were found guilty. . . .

. . . . .

Your committee agrees that heavier penalties, together with the forfeiture of boats, guns, and other equipment used by commercial hunters should be a deterrent to those engaged in this illegal traffic, and is a needed addition to existing law.
S.Rep.No.1779, 86th Cong., 2d Sess. (1960), *reprinted in* 1960 U.S.Code Cong. & Admin. News pp. 3459, 3460.

The discussion in the Senate Report implies that Congress did not interpret the Act to provide for separate counts for each bird death; the implication is strongest in the statement that market hunters are subject to the same penalties as pleasure hunters who kill one bird in violation of the Act. Since a market hunter kills a number of birds, under the United States' interpretation, he would be subject to multiple counts. If this had been understood as the proper interpretation in 1960, then the need to amend the Act to increase the penalties would not have existed: A separate count could have been charged for each bird taken by a market hunter. If Congress had intended to increase the penalties and, at the same time, had understood that the Act then existing provided for multiple counts, it is difficult to understand why the Senate Report did not discuss multiple counts or why Congress felt the need to amend the Act.

One could argue that the 1960 Amendments might be distinguished on the ground that they did not alter the basic penalty provisions of the Act, now codified in section 707(a), under which the defendants are charged. Using this logic, the relevant congressional intent is that expressed in 1918 when the provisions were enacted. The 1918 legislative history is not helpful, however, because it speaks only of the need to prevent the "indiscriminate slaughter of birds," the same language that appears in the 1916 convention which the Act implemented. H.R.Rep.No.243, *supra* at 2. Although this language reflects a concern

about multiple deaths, it does not demonstrate a congressional intent to make each death a separate offense, at least when all the deaths are caused by a single act. Another possible ground for distinguishing the implication from the 1960 Amendments is to interpret them as permitting multiple counts for each bird killed by a market hunter. Under this theory, both section 707(a) and section 707(b) provide for multiple counts, the difference being that the possible penalties are greater under section 707(b). This theory avoids the implications drawn from the 1960 Amendments, but it is not supported by legislative history.

The rule to be applied in this case is expressed in the *Bell* case: "if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses . . . ." *Bell v. United States, supra* at 622. This court cannot find that Congress has provided "clearly and without ambiguity" for multiple counts in prosecutions under the MBTA in the circumstances of this case. Accordingly, nine of the ten counts brought against defendants Harris, Feeney and Michaud under the MBTA are dismissed.

(2) Application of the MBTA to Poisoning

Defendant Michaud argues that the MBTA was not intended to create criminal penalties for persons who killed migratory birds by poisoning them. This argument raises two questions: whether the Act can apply to poisoning under any circumstances and whether the Act can apply only to poisoning with the intent to kill migratory birds. The latter question is discussed in the following section.

The question here is whether the Act is limited to a prohibition on hunting or capturing birds. The MBTA prohibits a number of actions; section 703 provides in part:

it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell,

offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird . . . .

It is undeniable that Congress was concerned with hunting and capturing migratory birds when it enacted the MBTA; the legislative history confirms this concern. The fact that Congress was primarily concerned with hunting does not, however, indicate that hunting was its sole concern. Paring the language of section 703 down to its essentials, the section makes it illegal "at any time, by any means or in any manner, to . . . kill . . . any migratory bird . . . ." The use of the broad language "by any means or in any manner" belies the contention that Congress intended to limit the imposition of criminal penalties to those who hunted or captured migratory birds. Moreover, a number of songbirds and other birds not commonly hunted are protected by the conventions and so by the Act; Congress imposed criminal penalties on those who killed these birds as well as on persons who hunted game birds. The legislative history of the Act reveals no intention to limit the Act so that it would not apply to poisoning.

▪ The MBTA was used as a model for the enactment of the Bald and Golden Eagles Protection Act (BGEPA), 16 U.S.C. § 668 et seq., enacted in 1940. That Act includes the word "poison," so that the question is raised whether the specific inclusion of "poison" in the BGEPA indicates that the MBTA should be interpreted not to apply to killing by means of poison. Section 668(a) provides:

Whoever . . . shall . . . take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or in any manner, any bald eagle commonly known as the American eagle, or any golden eagle, alive or dead, or any part, nest, or egg thereof of the foregoing eagles, . . . shall be fined not more than $5,000 or

imprisoned not more than one year or both . . . .

Section 668c provides in part:

As used in section 668 to 668d of this title . . . "take" includes also pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, or molest or disturb . . . .

The word "poison" was added by the 1972 Amendments. Act of Oct. 23, 1972, Pub.L. No.92–535, § 4, 86 Stat. 1065. The primary purpose of the amendment was to reduce the scienter requirement. See S.Rep.No. 1159, 92d Cong., 2d Sess. (1972), reprinted in 1972 U.S.Code Cong. & Admin.News p. 4285. The Interior Department had taken the view that the Act did not apply to poisoning prior to the amendment unless the poison was deliberately put out to kill eagles. Congress reduced the scienter requirement and, "through an abundance of caution," also amended the definition of "take" in section 668c to include the word "poison" even though it was not clear that the latter change was necessary. Bean, The Evolution of National Wildlife Law 95 (CEQ 1977). In view of this legislative history, it is inappropriate to conclude that the inclusion of the word "poison" in the BGEPA indicates that the MBTA does not include killings by means of poison. Accordingly, this court interprets section 703 to include poisoning as a prohibited act within the meaning of the prohibition on killing "by any means or in any manner."

(3) Scienter Requirements Under the MBTA

The defendants urge that, even if the MBTA is interpreted to include poisoning, it cannot be interpreted to create criminal penalties for those who did not intend to kill migratory birds with poison. The United States admits that it has "no direct evidence of any intent on the part of any defendant to kill migratory birds through the spraying of Furadan." United States' Brief, Sept. 30, 1977, at 2. The United States asserts that there is no requirement under the Act that defendants be aware of wrongdoing or intend to violate the law and

that proof that defendants were responsible for the application of the pesticide to this field and that migratory birds died is sufficient for a finding of guilt.

This court will examine the two cases in which the propriety of criminal charges against persons who did not intend to affect migratory birds was discussed, as well as the scienter requirements applicable to prosecutions of hunters who violated the regulations under the Act. In addition, defendants present arguments against application of the Act to their conduct based on the requirements under the BGEPA and on the implications of the United States' interpretation. Finally, the court will examine the law relevant to other malum prohibitum crimes to determine the nature of the scienter requirements.

There is virtually no case law on the nature of the mens rea requirement under the MBTA when the defendant was not consciously involved in an activity he knew would affect migratory birds. Only two cases could be found, neither of which is of real precedential value here. The first is *United States v. Union Texas Petroleum*, 73–CR–127 (D.Colo., July 11, 1973). Union Texas maintained open oil sludge pits in which migratory birds landed, became coated with oil and died, resulting in criminal charges. The defendant argued that its actions were not covered by the Act because it had not engaged in purposeful killing. The court denied defendant's motion to dismiss, stating:

> We are unable to properly assess this intention at this time. Given the broad purposes of the Act and [its] language . . . we doubt that the statute was intended to be limited to hunting or other purposeful killing alone. Moreover, whether or not Defendants' "conduct" was intended to be covered by the Act appears to us to depend not upon the Defendants' conduct per se, but on whether the unlawful killings were performed with some degree of knowledge or volition.

The court declined to decide the question prior to trial, although it stated specifically that no criminal intent or guilty knowledge was needed for conviction. As it turns out, trial was never held because the defendant in this case and the defendants in the cases consolidated for purposes of the motion to dismiss pled guilty shortly after their motions were denied. The other case is the *FMC Corp.* decision discussed above. The published decision states:

> I am concerned about the application of 16 U.S.C. § 703 to bird deaths allegedly the result of drinking waste water discharged into defendant's lagoon. I have been unable to locate any cases where the statute has been applied in a similar situation with the exception of *United States v. Union Texas Petroleum* . . . . .
> . . . Migratory birds are killed by many accidental means, such as jet airplanes, air pollution and the windows of tall buildings. Their nests and eggs are destroyed in clearing land for housing, recreation and highways. Can the Government charge land developers and high rise building constructions with the deaths of birds under the statute?

*United States v. FMC Corp., supra* at 617 n.2. Despite this concern, it appears that the court may have decided that the United States need not prove purposeful killings; defendant's motion to dismiss was denied and the defendant was found guilty on a number of the counts under the Act. This case is of only marginal precedential value because the decision on the instant point was rendered from the bench.

In the hunting context, there have been a number of cases concerning the nature of the scienter requirements under the Act. The regulations promulgated pursuant to the Act prohibit the taking of migratory birds by the aid of bait or on or over a baited area. 50 C.F.R. § 20.21(8) (1976). The courts have held that knowledge of the bait is not an element of the offense. For example, in *United States v. Jarman*, 491 F.2d 764 (4th Cir. 1974), a field had been baited at least three days before the hunt, but the bait had been plowed under when the defendants were caught hunting. The regulations provide that a field remains

baited for ten days after complete removal of the bait. The *Jarman* court held that the United States did not have to prove knowledge of the bait for conviction and that Congress could omit all scienter requirements so that an unknowing violation would support conviction. In a similar case, *United States v. Schultze*, 28 F.Supp. 234, 236 (W.D.Ky.1939), the court declared: "In view of the broad wording of the Act, and the evident purpose behind the treaty and the Act, this Court is of the opinion that it was not the intention of Congress to require any guilty knowledge or intent to complete the commission of the offense and that accordingly scienter is not necessary." *Accord, United States v. Ireland*, 493 F.2d 1208 (4th Cir. 1973); *United States v. Ardoin*, 431 F.Supp. 493 (W.D.La.1977); *United States v. Reese*, 27 F.Supp. 833 (W.D. Tenn.1939). In other baiting cases, there is no discussion of scienter, but it is evident that no knowledge was required. *E. g., United States v. Cain*, 454 F.2d 1285 (7th Cir. 1972); *McDowell v. United States*, 383 F.2d 599 (8th Cir. 1967).

Two baiting cases do not fall exactly into the line of cases described above. In *United States v. Wood*, 437 F.2d 91 (9th Cir. 1971), the Ninth Circuit affirmed a conviction of certain defendants who fled when the agent approached. The magistrate who tried the case had ruled that no scienter was required under the Act but noted that flight created an inference of guilty knowledge. The district court reviewing the conviction ruled that, if scienter were required, the flight satisfied the requirement. The Ninth Circuit affirmed. This case does not indicate that the Ninth Circuit considered scienter a necessary element of the offense; instead, the court simply declined to rule on the question because the defendants' guilt was established in any event. In only one case has a court found that knowledge was an element of the offense: *United States v. Bryson*, 414 F.Supp. 1068 (D.Del.1976). The *Bryson* court noted that there are two baiting offenses: taking birds with the aid of bait and taking birds on or over a baited area. The first requires some showing that the person had a role in the bait being

placed in the field or at least that the bait was put out for his benefit. With either showing, the court ruled that a person can be convicted for hunting anywhere within the zone of influence of the bait. The second offense is absolute; the person is guilty if he hunts on or over a baited area even without proof of his knowledge or his participation in the placing of the bait. The court drew these distinctions from the language of the regulation.

Defendants in this case argue that the baiting cases are all distinguishable on the ground that they involve persons who intended to kill migratory birds and happened, knowingly or unknowingly, to do so in an illegal manner. Defendants urge that they never intended to kill birds or to affect birds in any manner and that, consequently, the baiting cases are inapplicable. The United States responds that knowledge of the birds and intent to affect birds is irrelevant and that the Act permits conviction of any person whose actions result in the death of birds. Defendants present two arguments in favor of their position: the first arises from the provisions of the Bald and Golden Eagles Protection Act (BGEPA) and the second is based on the implications of the United States interpretation of the Act.

■■■ The BGEPA provides in part: Whoever . . . shall knowingly, or with wanton disregard for the consequences of his act take . . . any bald eagle commonly known as the American eagle, or any golden eagle, . . . shall be fined not more than $5,000 or imprisoned not more than one year or both . . . ..

16 U.S.C. § 668(a). The defendants argue that the United States must prove that they "knowingly, or with wanton disregard for the consequences of [their acts]," sprayed the pesticide on the field and thereby killed the birds. Although the provisions of the BGEPA were modeled from the MBTA, the BGEPA provides a different scheme of regulation: its criminal penalties are far more severe than those under the

MBTA and it provides for civil penalties of up to $5,000 with no scienter requirement. *Id.* § 668(b). As it turns out, the words "knowingly, or with wanton disregard for the consequences of his act" were added to the BGEPA in 1972, and the word "willfully" deleted, in order to reduce the scienter requirements. The Senate Report states:

> The word "knowingly" means that the offender knew what he was about to do and, with such knowledge, proceeded to do the act. The additional words "with wanton disregard for the consequences of his act" were also added to lessen the degree [of] knowledge required to be proved in order to obtain a conviction under the Act. The evidence would have to show more than mere negligence; while there is no intent to injure, the person must be conscious from his knowledge of surrounding circumstances and conditions that his conduct will naturally and probably result in injury.

S.Rep.No.1159, *supra* at 4289. It is not questioned that proof satisfying the requirements expressed above would be sufficient for conviction under the MBTA, which includes no language applicable to scienter. The question is whether a lesser degree of knowledge would be sufficient. The more severe criminal sanctions possible under the BGEPA and the differences in the scheme of regulation indicate that the law applicable to that Act is not necessarily directly applicable to the MBTA.[11] The fact that Congress chose to require proof of knowledge or wanton disregard under the BGEPA cannot require this court to read such a standard of proof into the MBTA, particularly in view of the line of baiting cases in which knowledge or even negligence was not necessary for conviction.

Defendants' second argument is based on carrying the United States' position to the extreme. Defendant Michaud's statement is representative:

> The theory of the government, in the case before this Court, is a novel one. Be-

cause an American Widgeon, or more than one, has been killed, someone must be guilty. The logical extension of such a theory is that if the judge or any person were driving down the road, out of duck season, and an American Widgeon flew into the car and was killed, prosecution under The Migratory Bird Treaty Act would be justified.

Defendant Michaud's Brief, Aug. 4, 1977, at 1–2. Obviously, prosecution would not be justified in the hypothetical presented by the defendant; the hypothetical car driver, however, does not stand in the same position as the defendants here. The driver is not reasonably in a position to prevent the bird's death whereas a person applying pesticide might be able to foresee the danger and prevent it.

The law relevant to the defendants' knowledge here is similar to that applicable to their knowledge under FIFRA that the birds fed repeatedly in the field. The criminal offense in both instances is malum prohibitum. The words of the Supreme Court in *United States v. Balint* are directly relevant here:

> in the prohibition or punishment of particular acts, the state may in the maintenance of a public policy provide "that he who shall do them shall do them at his peril and will not be heard to plead in defense good faith or ignorance."

*United States v. Balint, supra* at 302, *quoting Shevlin-Carpenter Co. v. Minnesota*, 218 U.S. 57, 69, 30 S.Ct. 663, 666, 54 L.Ed. 930 (1910). In *Morissette v. United States*, 342 U.S. 246, 256, 72 S.Ct. 240, 246, 96 L.Ed. 288 (1952), the Supreme Court discussed the nature of what it termed "public welfare offenses":

> legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reason-

---

11. *See United States v. Hetzel*, 385 F.Supp. 1311 (W.D.Mo.1974) ("Rules of decision developed under the Migratory Bird Treaty Act may not automatically be applied to a prosecution under the Bald Eagle Protection Act."). The reverse is also true.

ably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime.

The instant case is one in which the guilty act alone is sufficient to make out the crime.[12] When dealing with pesticides, the public is put on notice that it should exercise care to prevent injury to the environment and to other persons; a requirement of reasonable care under the circumstances of this case does not offend the Constitution. If defendants acted with reasonable care or if they were powerless to prevent the violation, then a very different question would be presented. *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 76, 84 S.Ct. 559, 563, 11 L.Ed.2d 536 (1964). There is no need to reach that question prior to the presentation of proof at trial because it involves facts not yet before this court. *Id.* At this point in the case, it is sufficient to declare that the MBTA can constitutionally be applied to impose criminal penalties on those who did not intend to kill migratory birds. Defendants' motion to dismiss on the ground that the Act cannot apply to the conduct charged in the information is denied.

### (4) Separate Counts for the Same Offense

█ Defendant Michaud moves to dismiss the counts against him on the ground that the FIFRA count and the MBTA counts constitute separate charges for the same offense and that the same act cannot constitute two separate crimes under the circumstances of this case. This argument can be readily rejected. In *Aiuppa v. United States*, 393 F.2d 597 (9th Cir. 1968), *vacated on other grounds sub nom. Giordano v. United States*, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1959), the Ninth Circuit held that a defendant could properly be charged under the MBTA in one count with the illegal possession of migratory birds and in a second count with the illegal transportation of the same birds. The test to be applied, said the *Aiuppa* court, is whether the same evidence is required to sustain both counts. The court held that the charges were properly separate because one required proof of possession of birds in excess of the limit while the other required proof of an action in furtherance of transportation of the birds. If two counts could be charged under the circumstances in *Aiuppa*, then certainly two counts can be charged here. The FIFRA violation would be established even if no birds had been killed by the application of the pesticide, while conviction under the MBTA requires proof of death. Accordingly, defendant Michaud's motion to dismiss on the ground that two counts are charged for the same violation is denied.

### (5) Prosecutorial Misconduct

As a final ground for dismissal of the MBTA counts, defendant Michaud urges that the MBTA has been applied recently to an arbitrarily selected few, even though they had no intent to kill birds, while others have not been prosecuted who engaged in similar activities also causing the death of migratory birds. The defendant states that it is not fair to permit application of the Act to turn on the whims of the United States Attorney.

█ It appears that defendant Michaud is alleging selective prosecution. In *United*

---

12. In *United States v. Freed*, 401 U.S. 601, 613, 91 S.Ct. 1112, 1120 n.4, 28 L.Ed.2d 356 (1971), Justice Brennan's concurring opinion quotes the following language from *Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir. 1960):

"[W]here a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent."

*States v. Scott,* 521 F.2d 1188, 1195 (9th Cir. 1975), the Ninth Circuit held that one claiming selective prosecution must show both "that others similarly situated generally have not been prosecuted for conduct similar to that for which he was prosecuted" *and* that "his selection was based on an impermissible ground such as race, religion, or his exercise of his first amendment right to free speech." Defendant Michaud has totally failed to demonstrate the latter circumstances and has made only vague allegations as to the former. This court finds that no selective prosecution or other prosecutorial misconduct exists in this case, and defendant's motion to dismiss is therefore denied.

## MOTIONS FOR A BILL OF PARTICULARS

■ Defendants CFS and Harris have moved for a bill of particulars that would specify in detail certain information that they assert is essential to avoid the danger of surprise at trial. At oral arguments, defendants admitted that portions of the requested information were no longer necessary because the United States had made the information available. As to other matters, the United States provided the information at oral argument, and there is no present need for that information to be incorporated into a formal bill of particulars. A bill of particulars is not a matter of right, and it is not necessary if the United States has provided the information in admissions, stipulations or otherwise. In this case, the United States has opened its files for the defendants and provided the information when it was available. Defendants' most recent briefing has not discussed their motions for a bill of particulars, and it appears that they have dropped these motions. Accordingly, the motions are denied at the present time, although the defendants may renew their motions if they find the need for information properly subject to a motion for a bill of particulars.

## MOTIONS TO SEVER

Initially, all defendants moved to sever their trials from the trials of the other defendants. Recently, defendants CFS and Harris have stated that they no longer seek severance from each other, although they continue to seek severance of their combined trial from the trials of Feeney and Michaud. Brief of Nov. 22, 1977, at 14. Both Feeney and Michaud ask for separate trials. Motions for severance are governed by FRCrimP 14 which provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In a ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

■ In *O'Neil v. Nelson,* 422 F.2d 319 (9th Cir. 1970), the Ninth Circuit declared that "'[j]oint trials of persons charged together with committing the same offense or with being accessory to its commission are the rule, rather than the exception.'" *Id.* at 322, *quoting Parker v. United States,* 404 F.2d 1193, 1196 (9th Cir. 1968). This rule has a major exception applicable here: separate trials are essential when incriminating out-of-court statements of co-defendants admissable against the declarant but not against the co-defendants would be presented in evidence. This exception derives from *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Bruton,* the defendant and his co-defendant Evans were tried jointly for armed robbery. Evans had made an oral confession which was admitted in evidence against him at trial; the trial judge had given limiting instructions to the jury that the confession could not be used against the defendant. Evans did not take the stand. Although the oral confession did not name the defendant, the Supreme Court held that admission of the

confession at the joint trial was reversible error because the defendant could not cross-examine Evans and that the limiting instructions could not ensure that the jury was not influenced by the confession in its deliberations about the defendant's guilt.[13]

Each of the individual defendants in this case has made a statement to an investigator from the Fish and Wildlife Service which the United States intends to present in evidence at trial against the declarant. Defendants urge that *Bruton* forbids a joint trial under these circumstances because the trier of fact would be unable to segregate its consideration of the statements. The United States asserts that there are no grounds for severance in this case and asks this court to deny defendants' motions. In order to determine whether severance is required, this court ordered the United States to provide copies of the defendants' statements for inspection in camera, as authorized by FRCrimP 14.

An examination of these statements reveals that Feeney names Harris and Michaud; Harris names Feeney and Michaud; and Michaud names Feeney and refers to Harris as the "advisor" without naming him. Each of the defendants describes the events leading up to and following the application of the pesticide, and the descriptions are relatively consistent. Michaud refers to certain statements made to him by Feeney that would be unquestionably damaging to Feeney's defense. It is difficult to determine whether the information contained in the other statements would be damaging to defendants other than the declarants. The three statements are relatively consistent in their description, but each statement includes some information not contained in the others. Each of the defendants, however, urges that the information would be damaging, and for purposes of the motions to sever this court will assume that some adverse effect might arise from the introduction of the statements against the declarants at a joint trial.

■ There is little question that the United States will seek to introduce the statements at trial, so this case does not fall into the line of cases holding that severance need not be granted when the United States volunteers not to use the statements. *E. g., United States v. Meyer*, 404 F.2d 254, 255 (9th Cir. 1968). None of the defendants has expressed an intention to take the stand; if the declarant takes the stand, there is no *Bruton* problem because the co-defendant may cross-examine. *E. g., Rios-Ramirez v. United States*, 403 F.2d 1016, 1017 (9th Cir. 1968).

■ The Ninth Circuit has recognized certain other exceptions to the *Bruton* rule. First, there is no problem when the statement or confession by a co-defendant that did not take the stand is innocuous or not incriminating to the objecting party. *E. g., United States v. Carlson*, 423 F.2d 431, 458 (9th Cir. 1970); *United States v. Davis*, 418 F.2d 59, 63 (9th Cir. 1969) (collecting the cases). The difficulty with this exception is that it is very hard to determine before trial whether the information would be innocuous. When faced with an appeal after trial, the Ninth Circuit has the benefit of the full transcript to determine the extent

---

**13.** The question of severance would not arise if defendants were not entitled to a jury trial. *Cockrell v. Oberhauser*, 413 F.2d 256, 258 (9th Cir. 1969) (holding that the *Bruton* rule does not apply when defendants are tried before a court instead of a jury). In this case, the MBTA count, standing alone, would not entitle defendants to a jury trial because its maximum penalties are six months imprisonment or $500 fine, or both. *E. g., United States v. Jarman, supra; United States v. Cain*, 454 F.2d 1285 (7th Cir. 1972) (both involving prosecutions under the MBTA). In this case, however, defendants are also charged under FIFRA which provides for up to a $25,000 fine against CFS (Count 1) and for 30 days or $1,000 fine or both against the individual defendants (Count 2). The penalties differ for CFS and the individual defendants because the Act distinguishes between a "registrant, commercial applicator, wholesaler, dealer, retailer, or other distributor" subject to up to one year imprisonment or $25,000 fine, 7 U.S.C. § 136*l*(b)(1), and a private applicator or other person not included in subsection (1) subject to only 30 days imprisonment and a $1,000 fine. Because of the maximum possible fine, defendant CFS is entitled to a jury trial without question. *United States v. Hamdan*, 552 F.2d 276 (9th Cir. 1977).

of the incriminating effect. This court must decide prior to trial and, with an abundance of caution, rules that the statements are not clearly non-incriminating. A second exception from *Bruton* has been used when the statement or confession is not a vitally important part of the prosecutor's case. *E. g., United States v. Carlson, supra* at 437, *citing Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 1423, 22 L.Ed.2d 684 (1969). This exception, like the first, is suitable more at the appellate level than at a pretrial motion. The fact that the United States has not volunteered not to use the statements indicates that it believes they are important to its case. Finally, the Ninth Circuit has occasionally looked to the fact that the *Bruton* confession was a "powerfully incriminating extrajudicial statement" and affirmed the admission of a less incriminating statement by a declarant who did not take the stand at a joint trial. *E. g., United States v. Carlson, supra* at 437, *citing United States v. Davis, supra; Cortez v. United States,* 405 F.2d 875, 876 (9th Cir. 1968). Although using this language, the cases held either that the statement was not incriminating or that the other evidence of guilt was overwhelming so that admission of the statement amounted to harmless error. This court is not in a position to determine whether the other evidence of guilt is overwhelming at this time, and so cannot use this exception from *Bruton* as grounds to deny the motions for severance.

The United States cites the "interlocking confessions" doctrine, used in some circuits as a basis for denial of severance. The Second Circuit has described the doctrine in the following terms:

> error of constitutional dimensions does not inevitably occur if the questioned confession is admitted under proper instructions from the court concerning its limited use and purpose. The likelihood of error must be measured against the prejudicial consequences of the failure of the jury to follow the court's instructions, i. e., the "devastating" effect of the incriminations contained in the codefendant's admissions. . . .

This situation would clearly obtain were the defendants to voluntarily sign identical confessions. However, since confessions are rarely maternal twins, the court must look to their substance to see whether they interlock sufficiently on vital points to indicate a common genesis. If they do, "devastating" effects do not follow from their admission.

This "interlocking confession" doctrine does not require absolute identity of statements. *United States ex rel. Ortiz v. Fritz,* 476 F.2d 37 (2d Cir. 1973). It is sufficient if the two confessions are substantially the same and consistent on the major elements of the crime involved. *United States ex rel. Stanbridge v. Zelker,* 514 F.2d 45, 48–49 (2d Cir.), *cert. denied,* 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975). This exception to *Bruton* was established in the Second Circuit in *United States ex rel. Catanzaro v. Mancusi,* 404 F.2d 296 (2d Cir. 1968), *cert. denied,* 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970), and has been followed in that circuit since 1968. The interlocking confessions doctrine was questioned in *United States ex rel. Ortiz v. Fritz,* 476 F.2d 37, 40 (2d Cir.), *cert. denied,* 414 U.S. 1075, 94 S.Ct. 591, 38 L.Ed.2d 482 (1973), in which Judge Oakes noted that the doctrine did not satisfy the second underpinning of *Bruton*: the fact that the credibility of a co-defendant's confession is "inevitably suspect." *Bruton* indicated that the suspect credibility of the confession is highlighted when the declarant is subject to cross-examination and the jury is instructed to weigh the testimony carefully. *Bruton v. United States, supra* at 1628. Judge Oakes stated:

> Despite the defendant's own confession, the jury may still look to the incriminating statements of a codefendant, or to the cumulative impact of those statements coupled with the defendant's own statements, to find the defendant's guilt . . . . .

*United States ex rel. Ortiz v. Fritz, supra* at 40. For this reason the *Ortiz* court found itself "somewhat uncomfortable with the implications of *Catanzaro*." *Id.* Nonetheless, the court applied the doctrine and re-

jected the defendant's appeal. The Second Circuit has since applied the doctrine in other cases. *E. g., United States v. Deberry,* 487 F.2d 448 (2d Cir. 1973); *United States ex rel. Stanbridge v. Zelker, supra.*

A number of other circuits have adopted the interlocking confessions doctrine, following the lead of the Second Circuit. In *United States v. Spinks,* 470 F.2d 64, 66 (7th Cir.), *cert. denied,* 409 U.S. 1011, 93 S.Ct. 456, 34 L.Ed.2d 305 (1972), the court applied the doctrine, stating that there was no merit to the claim of prejudice arising from the lack of cross-examination of the declarant. The court found it ludicrous for the defendant to argue that he could have broken down the declarant's confession when his own confession remained unchallenged. Although the confessions corroborated each other, the court believed that any error was harmless. Similarly, in *United States v. Walton,* 538 F.2d 1348, 1354 (8th Cir.), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 647, 50 L.Ed.2d 628 (1967), the court adopted the doctrine and stated: "From a practical standpoint, it makes no difference whether we say that the admission of the confessions was not error or whether we say that the error, if any, was 'harmless beyond a reasonable doubt.'" The doctrine has also been adopted in the Tenth Circuit. *Metropolis v. Turner,* 437 F.2d 207 (10th Cir. 1971).

The Ninth Circuit has never adopted the interlocking confessions doctrine, and this court could find no case in which the Ninth Circuit discussed the doctrine. Accordingly, this court must decide whether the doctrine, accepted by at least four other circuits, should be applied here in a denial of defendants' motions for severance. Recognizing that this is a close question, this court has decided that application of the doctrine is not appropriate under the circumstances of this case. Judge Oakes' questions concerning the propriety of the doctrine in view of the language of the *Bruton* case have considerable merit. *See United States ex rel. Ortiz v. Fritz, supra.* Moreover, the circuit courts have applied the doctrine to cases on appeal from completed trials and to petitions for habeas corpus; in such circumstances, there is a strong tendency to uphold the decision by the court below. A number of these cases have deemed the admission of the confession "harmless error" based on the other evidence against the defendant, the lack of devastatingly incriminating information in the confession, or similar grounds. This court is unwilling to permit a joint trial on the assumption that the Ninth Circuit would deem the admission of the statements "harmless error." Although such an error might be harmless in the eyes of the Ninth Circuit, it would still be an error. Accordingly, defendants' motions for severed trials are granted: defendants Michaud and Feeney will each be tried separately from each other and from defendants CFS and Harris who will be tried together.

In conclusion it is ordered that (1) defendants' motions to dismiss the FIFRA counts are denied, with the exception that decision on whether the words "repeatedly" and "known" are vague as applied is deferred until after all parties have rested on their evidence; (2) defendants' motions to dismiss nine of the ten MBTA counts are granted; (3) defendant Michaud's motion to dismiss the remaining MBTA count on the ground that the Act does not apply to poisoning is denied; (4) defendants' motions to dismiss the remaining MBTA count on the ground that the Act does not apply to their conduct is denied; (5) defendant Michaud's motion to dismiss on the ground that the FIFRA and MBTA counts charge separate counts for the same offense is denied; (6) defendant Michaud's motion to dismiss because of prosecutorial misconduct is denied; (7) defendants' motions for a bill of particulars are denied at the present time; and (8) defendants' motions for separate trials are granted.

IT IS SO ORDERED.